**FORT STEWART SCHOOLS, Petitioner, Cross–Respondent,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent, Cross–Petitioner,**

**Fort Stewart Association of Educators, Intervenor.**

**No. 87–8734.**

United States Court of Appeals, Eleventh Circuit.

Nov. 21, 1988.

William Kanter, Appellate Staff, Civil Div., Dept. of Justice, Ronald R. Austin, Overseas Educ. Ass'n, Rick Richmond, U.S. Dept. of Justice, Civil Div., Appellate Staff, Washington, D.C., for petitioner, cross-respondent.

Ruth Peters, Sol., F.L.R.A., Pamela P. Johnson, William E. Persina, Washington, D.C., for respondent, cross-petitioner.

Richard J. Hirn, Washington, D.C., for intervenor-Ft. Stewart Ass'n of Educators.

Before VANCE and HATCHETT, Circuit Judges, and NESBITT *, District Judge.

HATCHETT, Circuit Judge:

Fort Stewart Schools (Army) seeks review of a Federal Labor Relations Authority (FLRA) decision and order requiring it to negotiate three proposals with the Fort Stewart Association for Educators (Union). The FLRA and the Union cross-petition this court to enforce the FLRA's decision and order. For the reasons discussed below, we grant the FLRA's and Union's petition to enforce the FLRA's order and deny the Army's petition for review.

## FACTS

The Army operates two elementary schools for military and civilian personnel's dependents (dependents schools) at Fort Stewart, Georgia. *See* 20 U.S.C. § 241 (1974 & Supp.1988) (Secretary of Education authorized to make arrangements with federal agencies to operate schools under certain circumstances). The schools provide free public education for military and civilian personnel's children who reside on the federal property. The Union, an affiliate of the National Education Association, acts as the collective bargaining representative

---

* Honorable Lenore C. Nesbitt, U.S. District Judge for the Southern District of Florida, sitting by designation.

for the schools' ninety-nine teachers and other employees.

During contract negotiations with the Army, the Union submitted three proposals for bargaining. The first proposal included sections which set mileage reimbursement, mandated certain insurance programs, and gave the Union the right to review and comment on salary schedules.[1] The second proposal suggested a fixed salary increase of 13.5–percent for the teachers and other employees for the subsequent school year.[2] The third proposal detailed various leave practices such as personal leave, sick leave, professional leave, maternity leave, and leave without pay.[3] The Army refused to negotiate these three proposals, contending that the proposals did not involve mandatory bargaining matters.

## PROCEDURAL HISTORY

The Union filed a negotiability appeal with the FLRA seeking a determination that each proposal involved a mandatory bargaining subject. *See* 5 U.S.C. § 7117(c) (1980). The FLRA agreed with the Union and ordered the Army to negotiate the three proposals with the Union.[4]

In reaching its decision, the FLRA rejected all the Army's contentions. First, the FLRA dismissed the Army's contention that the proposals do not concern conditions of employment. The FLRA reiterated its prior conclusion that the Federal Service Labor–Management Relations Act (FSLMRA) does not preclude all bargaining over employee compensation. 5 U.S.C. §§ 7101–7135 (1980). *See Fort Bragg Unit of N.C. Assoc. of Educators, Nat'l. Educ. Assoc. and Fort Bragg Dependents Schools, Fort Bragg, N.C.,* 12 F.L.R.A. 519 (1983) (WESTLAW FLB–FLRA database) (Congress did not intend to exclude dependents schools' employees' compensation and

related benefits from negotiable conditions of employment in the FSLMRA). Furthermore, the FLRA found that the proposals involved "conditions of employment" because "the matters proposed are not specifically provided for by law and are within the discretion of the [Army]; and ... the proposals are not otherwise inconsistent with law, applicable government-wide rule or regulation, or with an [Army] regulation supported by a compelling need."[5] *American Federation of Government Employees, AFL–CIO, Local 1897 and Dept. of the Air Force, Eglin Air Force Base, Florida,* 24 F.L.R.A. (No. 41) 377 (1986) (WESTLAW FLB–FLRA database). Chairman Calhoun dissented, however, claiming that the duty to bargain does not encompass proposals concerning wages and money-related fringe benefits absent a clear congressional intent to make such matters negotiable.

The FLRA also held that the proposals did not interfere with the Army's right to determine its budget. The FLRA concluded that the Army failed to show that the proposals would significantly and unavoidably increase the Army's costs without producing compensating benefits to offset the alleged costs. *See American Federal of Gov't Employees, AFL–CIO and Air Force Logistics Command, Wright–Patterson Air Force Base, Ohio,* 2 F.L.R.A. (No. 77) 604 (1980) (WESTLAW FLB–FLRA database), *enforced as to other matters sub nom. Dep't. of the Air Force v. FLRA,* 659 F.2d 1140 (D.C.Cir.1981), *cert. denied sub nom., AFGE v. FLRA,* 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982) (interference with the right to set a budget requires prescribing particular programs or amount allocated for such programs, or causing inevitable significant cost increases without any offsetting benefits).

1. See Appendix A.

2. Proposal 2
   The Association and the Employer agree that the salary increase for all bargaining unit members will be 13.5% for the school year.

3. See Appendix B.

4. The FLRA excluded three sections from its order: Sections L and M of Proposal 1 and Section F of Proposal 3. The FLRA held that these sections involved nonnegotiable matters.

5. Alternatively, the FLRA concluded that even if the Army properly refrained form negotiating the compensation matters, it still had a duty to negotiate Sections A, C, and D of Proposal 1 because they did not involve compensation.

The FLRA rejected the Army's contention that bargaining over compensation violates other federal laws. First, the FLRA determined that the proposals do not conflict with laws that regulate the solicitation of contract bids in the procurement process. The procurement laws mandate that federal agencies award contracts for professional services through competitive bidding. 10 U.S.C. § 2304 (1983 & Supp.1988). The FLRA noted that it previously dismissed this same claim because procurement law does not govern teachers and employees in the dependents school system. *See Fort Knox Teachers Assoc. and Board of Educ. of the Fort Knox Dependent Schools,* 27 F.L.R.A. (No. 34) 203 (1987) (WESTLAW FLB–FLRA database) (dependent school teachers and employees are federal government employees rather than independent contractors making procurement laws inapplicable to them). Second, the FLRA concluded that the proposals do not violate the Anti–Deficiency Act. The Anti–Deficiency Act prohibits an agency from obligating itself to pay money before Congress appropriates funds. 31 U.S.C. § 1341 (1983). Although the proposals obligate the Army to spend funds for salaries in the succeeding fiscal year, the FLRA noted that the Army's obligation accrues only when the employees earn the salaries. *Fort Knox Dependent Schools,* 27 F.L.R.A. at 217. Therefore, the government will appropriate funds before the Army incurs these obligations.

Finally, the FLRA ruled that the Army did not establish a compelling need for its regulation that requires it to pay dependents schools' employees a comparable salary to local public school employees. The FLRA, relying on a prior decision, held that "nothing in either [20 U.S.C. § 241] or its legislative history persuades us that Congress intended to restrict the [Army's] discretion as to the particular employment practices which could be adopted." *See Fort Knox Teachers Assoc.,* 27 F.L.R.A. at 216 (comparable education requirement in section 241 does not mandate comparable compensation). Consequently, the FLRA concluded that the Army failed to demonstrate a compelling need for its regulation.

Moreover, the FLRA concluded that even if a compelling need existed, the Army did not show that Sections A through G, and I and J, of Proposal 1 conflicted with the Army's regulation.

The Army brought this petition for review of the FLRA's decision and order pursuant to the FSLMRA. *See* 5 U.S.C. § 7123(a) (1980). In response, the FLRA and the Union cross-petitioned for enforcement of the FLRA's order. *See* 5 U.S.C. § 7123(b) (1980).

## ISSUES

The Army petitions for review of the following issues: (1) Whether the Army has a statutory duty to bargain because the Union's proposals involve "conditions of employment" within the Army's discretion; (2) whether the Army established a compelling need for its regulation that mandates equality of compensation between employees in dependents schools and local public schools; and (3) whether the Union's proposals interfere with the Army's right to determine its own budget.

## DISCUSSION

### A. *Conditions of Employment*

The FSLMRA gives federal employees the right to negotiate over "conditions of employment." 5 U.S.C. § 7102(2) (1980). Conditions of employment include "personnel policies, practices, and matters, whether established by rule or regulation, or otherwise, affecting working conditions...." 5 U.S.C. § 7103(a)(14) (1980). Despite this broad definition, Congress has imposed two limits on the scope of the duty to bargain. First, the term "conditions of employment" excludes any matters "specifically provided for by Federal Statute." 5 U.S.C. § 7103(a)(14)(C) (1980). Second, the duty to bargain excludes matters that conflict with "any Federal law or Government-wide rule or regulation," or any agency regulation for which a compelling need exists. 5 U.S.C. § 7117(a)(2) (1980).

The Army contends that "conditions of employment" in the FSLMRA do not include wages and money-related benefits.

The Army further contends that even if the term "conditions of employment" is ambiguous, the Union's proposals conflict with federal law, excluding them from the statutory duty to bargain. The Union and the FLRA contend that the Army has a duty to negotiate the Union's proposals because the proposals involve conditions of employment within the Army's discretion.

### 1. Congressional Intent: FSLMRA's Language and Legislative History

■ Relying on prior decisions, the FLRA determined that the FSLMRA does not prohibit bargaining over compensation and fringe benefits under the following conditions: the agency has discretion over such matters; Congress has not specifically provided for these matters; and the proposals do not conflict with law, government-wide rule or regulation, or an agency regulation for which a compelling need exists. *Fort Knox Teachers Assoc. and Fort Knox Dependents Schools*, 28 F.L.R.A. (No. 29) 179 (1987) (WESTLAW, FLB–FLRA Database). Because this FLRA decision is within its authority, we must defer to its conclusion unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2) (1977); *West Point Elementary School Teachers Assoc. v. FLRA*, 855 F.2d 936, 939–40 (2d Cir.1988); *see Library of Congress v. FLRA*, 699 F.2d 1280, 1289 (D.C.Cir.1983) ("Congress has specifically entrusted the [FLRA] with the responsibility to define the proper subjects for collective bargaining [under the FSLMRA], drawing upon its expertise and understanding of the special needs of the public sector labor relations.")

Our examination of the FSLMRA and its legislative history supports the FLRA's conclusion. The FSLMRA defines conditions of employment as "personnel policies, practices and matters ... affecting working conditions...." 5 U.S.C. § 7103(a)(14) (1980). This definition alone does not exclude compensation and fringe benefits.

The Army, however, argues that a comparison between the FSLMRA and the National Labor Relations Act (NLRA) reveals that "conditions of employment" do not include wages and fringe benefits. The NLRA allows bargaining over "wages, hours and *other* terms and conditions of employment." 29 U.S.C. § 158(d) (Supp. 1988) (emphasis added). The Army urges that "conditions of employment" in the FSLMRA encompasses a narrower range of bargainable matters than the NLRA terminology because the FSLMRA did not specifically list wages and hours as bargainable matters. In contrast to the Army's position, the absence of the terms "wages" and "hours" from the FSLMRA does not prove that Congress intended to exclude them from negotiations. Rather, the NLRA's description of bargainable matters supports the FLRA's position. By using the word "other," Congress included wages and hours in the general category of "conditions of employment." Congress likely specified "wages" and "hours" in the NLRA merely to illustrate the meaning of the new term "conditions of employment." In the FSLMRA, Congress simply used the general term "conditions of employment," which encompasses wages, to define the scope of negotiable matters.

The Army further argues that another section of the FSLMRA demonstrates that Congress did not intend conditions of employment to include wages. The Civil Service Reform Act of 1978, which includes the FSLMRA, specifically provides that the FSLMRA does not apply to prevailing rate employees who had negotiated over pay prior to August 19, 1972, to the extent that any of the FSLMRA's provisions conflict with their negotiation practices. The Army contends that this section serves no purpose if the FSLMRA authorizes employees, whose wages Congress did not set, to bargain for wages. The legislative history demonstrates that this section serves a purpose even if the FSLMRA allows bargaining over wages. Congressman Ford stated this section's purpose: "This provision is required because of two recent rulings by the Comptroller General which ... held that specific legislative authorization was necessary for these employees to continue to negotiate such provisions in accordance with prevailing private industry practice."

124 Cong.Rec. H8468 (daily ed. Aug. 11, 1978) (remarks of Rep. Ford). Thus, this provision clarifies and extends the exemption from the prevailing rate act for such employees. *American Federal of Government Employees*, 24 F.L.R.A. at 380.

Turning from the FSLMRA's language to its legislative history, the Army argues, citing the Third Circuit, that Congress did not intend to allow bargaining over compensation. The Third Circuit recently held that Congress did not intend the FSLMRA to allow bargaining over the Navy's pay practices for the Military Sealift Command's (MSC) civilian mariners. *Dep't. of the Navy, Military Sealift Command v. FLRA*, 836 F.2d 1409 (3d Cir.1988). The court found that section 5348 of the prevailing rate system specifically gives the Navy limited discretion over the MSC's pay practices. *Dep't. of the Navy*, 836 F.2d at 1410. Because bargaining over such pay practices is outside the Navy's discretion, such negotiation would conflict with law, excluding these matters from the duty to bargain. The court examined the FSLMRA's legislative history to determine if Congress intended the FSLMRA to supersede section 5348 and subject the MSC's pay practices to collective bargaining. *Dep't. of the Navy*, 836 F.2d at 1417. The court concluded that Congress did not intend the FSLMRA to allow federal employees to negotiate over compensation. *Dep't. of the Navy*, 836 F.2d at 1419.

In contrast, the Second Circuit implicitly adopted the FLRA's conclusion that the FSLMRA does not bar negotiation of proposals involving compensation and fringe benefits. *See West Point Elementary School Teachers Assoc.*, at 942. The court concluded that "conditions of employment" in the FSLMRA included wage and fringe benefit proposals when the federal government did not specifically provide for such matters. *West Point Elementary School Teachers Assoc.*, at 942.

Despite the Third Circuit's holding that Congress did not intend the FSLMRA to allow federal employees to bargain over wages, we agree with the FLRA and the Second Circuit that Congress did not intend

to preclude all bargaining over compensation. The legislative history indicates that Congress intended to treat wages and fringe benefits as other conditions of employment; the parties must bargain over them unless a federal statute specifically provides for them or the proposed matters would conflict with law. *See* 5 U.S.C. §§ 7103(a)(14)(C) and 7117(a)(1) (1980). Because federal law dictates nearly all federal employees' wages, the legislative history contains many general statements claiming that the FSLMRA does not make wages negotiable. *See* 5 U.S.C. §§ 5341–5349 (1980 & Supp.1988).

A close examination of the congressional reports and debates reveals that the FSLMRA's supporters made these statements with the understanding that Congress generally regulates such matters through its prevailing rate acts, not with the understanding that the FSLMRA barred all wage negotiations. The House Report on the Committee's bill provides: "Federal pay will continue to be set in accordance with the pay provisions of title 5, and fringe benefits, including retirement, insurance, and leave, will continue to be set by Congress." H.R.Rep. No. 95–1403, 95th Cong., 2d Sess. 12 (1978). Congressman Udall, the sponsor of the amended version which Congress ultimately enacted into law stated, "[t]here is not really any argument in this bill or in this title about federal collective bargaining for wages and fringe benefits and retirement.... All these major regulations about wages and hours and retirement and benefits will continue to be established by law through congressional action." 124 Cong.Rec. H9633 (daily ed. Sept. 13, 1978) (remarks of Rep. Udall); *reprinted in* Subcomm. on Postal Personnel and Modernization of the House Comm. on Post Office and Civil Service, 96th Cong., 1st Sess., Legislative History of the Federal Service Labor–Management Relations Statute, Title VII of the Civil Service Reform Act of 1978, at 923 (1979) [hereinafter *Legislative History* ]. Moreover, Congressman Ford who strenuously advocated the bill's adoption stated: "[N]o matters *that are governed by statute (such as pay, money-related fringe benefits*, retire-

ment and so forth) could be altered by a negotiated agreement." 124 Cong.Rec. H8468 (daily ed. Aug. 11, 1978) (remarks of Rep. Ford); *Legislative History* at 855–56 (emphasis added). Finally, Congressman Clay, supporting Congressman Udall's substitute legislation, stated:

> Section 7103(a)(14)(D), removing from subjects of bargaining those matters specifically provided for by Federal statute, was adopted by the committee and retained in the Udall substitute with the clear understanding that only matters "specifically" provided for by statute would be excluded under this subsection. Thus, where a statute merely vests authority over a particular subject with an agency official with the official given discretion in exercising that authority, the particular subject is not excluded by this subsection from the duty to bargain over conditions of employment.

124 Cong.Rec. H9638 (daily ed. Sept. 13, 1978) (remarks of Rep. Clay); *Legislative History* at 933. Thus, although some legislators' remarks baldly assert that wages are not negotiable, the above comments indicate that the legislators merely were assuring their peers that the FSLMRA would not supplant specific laws which set wages and benefits.

The legislative history additionally demonstrates that Congress intended the FSLMRA to continue the existing practices regarding the negotiation of wages. Congressman Clay stated that "employees *still* ... cannot bargain over pay." 124 Cong. Rec. E4293 (daily ed. Aug. 3, 1978) (remarks of Rep. Clay); *Legislative History* at 839 (emphasis added). Similarly, Congressman Devinski stated that wages and fringe benefits remained beyond the scope of collective bargaining. 124 Cong.Rec. H9639 (daily ed. Sept. 13, 1978) (remarks of Rep. Devinski); *Legislative History* at 935.

One such existing practice allowed federal employees to negotiate wages in the rare instances where Congress did not specifically establish wages and fringe benefits. *American Fed'n of Gov't Employees*, 24 F.L.R.A. at 381; *see United Fed'n of Col-lege Teachers, Local 1460 and U.S. Merchant Marine Academy*, 1 FLRC 211 (1972) (Federal Labor Relations Council (FLRC) held that the academy's teachers could bargain for their wages because their proposals did not violate the laws giving the Secretary of Commerce discretion to set their salaries); *Overseas Educ. Assoc., Inc. and Dept. of Defense, Office of Dependents Schools*, 6 FLRC 231 (1978) (the duty to bargain encompassed proposals involving procedures and formulas for setting teacher compensation because the federal act governing these teachers' pay did not bar negotiation on the proposals). Congress should have known of this practice because the FSLMRA specifically mandates that decisions under Executive Order 11491 continue in effect unless superceded; the FLRC administered the above decisions under this executive order. 5 U.S.C. § 7135(b) (1980). Consequently, we agree with the FLRA that Congress did not intend to preclude bargaining over wages and related benefits.

### 2. Relationship of the Union's Proposals to Federal Law

As mentioned above, the FSLMRA excludes from conditions of employment any matters provided for by federal statute or inconsistent with federal law. 5 U.S.C. §§ 7103(a)(14)(C) & 7117(a)(2) (1980). Although the federal prevailing rate act sets wages for most federal employees, the statute creating the Fort Stewart schools specifically excludes the schools' employees from these federal laws. *See* 20 U.S.C. § 241. The Army contends, however, that federal law still provides for these employees' wages and benefits. The Army argues that section 241 specifically sets compensation and leave practices for these employees because this section requires it to compensate the dependents schools' employees according to local public school practices. The FLRA concluded that section 241 does not require the Army to equalize the dependents school employees' and local school employees' compensation. We need not defer to the FLRA's conclusion, however, because such deference only applies when the FLRA interprets the FSLMRA. *See West*

*Point Elementary School Teachers Assoc.,* at 940; *Dep't. of Treasury v. FLRA,* 837 F.2d 1163, 1167 (D.C.Cir.1988) (courts need not defer to FLRA decision interpreting a statute other than the FSLMRA).

Section 241 requires that the Army "to the maximum extent practicable" provide a comparable education to local public schools at a cost per pupil not exceeding the per pupil cost of free public education in local communities. 20 U.S.C. § 241(a) & (e) (1974 & Supp.1988). The Second Circuit recently held that these provisions did not specifically set the dependents schools' teachers' salaries because the Army could maintain cost parity and educational comparability despite wide variations in teachers' salaries; consequently, the Second Circuit concluded that the Army had a duty to bargain over a salary proposal. *West Point Elementary School Teachers Assoc.,* at 943.

■ We agree with the Second Circuit that section 241 does not specifically provide for the schools' teachers' and other employees' wages. First, section 241 as a whole demonstrates that the Army has wide discretion to set these employees' salaries. The third sentence of section 241(a) requires dependents schools outside the continental United States, Alaska, and Hawaii to provide a "comparable education" to free public schools in the District of Columbia. 20 U.S.C. § 241(a) (Supp.1988). In 1978, Congress added another sentence to section 241(a) which reads: "Personnel provided for under this subsection outside of the continental United States, Alaska, and Hawaii, shall receive such compensation, tenure, leave, hours of work, and other incidents of employment on the same basis as provided for similar positions in the public schools in the District of Columbia." 20 U.S.C. § 241(a) (Supp.1988). Interpreting "comparable education" to include comparable salaries would make the additional sentence redundant.

The Army argues that this sentence is not redundant if "comparable education" includes comparable wages, but rather, the sentence is unnecessary if comparable education did not incorporate comparable salaries. According to the Army, Congress amended section 241 because it wanted to raise the Puerto Rican dependents school employees' salaries above the local schools' insufficient wages. The Army argues that Congress could have raised their salaries without amending section 241 if this section did not require the Army to pay its school employees a comparable salary to local public school employees.

Contrary to the Army's contention, if comparable education included comparable salaries, Congress would not have needed to amend section 241 to raise the Puerto Rican schools' employees' pay. Section 241 already required the Army to provide the schools outside the United States with a comparable education to the District of Columbia's public schools; therefore, Congress did not need to add the new sentence if Congress only intended to raise the schools' salaries. Rather, Congress added this sentence to correct the existing pay practices which "invite[d] abuse by not specifying personnel practices, especially regarding salary...." H.R.Rep. No. 1137, 95th Cong., 2d Sess. 108, *reprinted in* 1978 U.S.Code Cong. & Admin.News 4971, 5078. Consequently, if comparable education included comparable salaries, Congress would not have needed to pass this amendment. We decline to construe the statute to render this provision mere surplusage. *See United States v. Wang Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972) (courts should not construe statutes to make words meaningless or surplusage where Congress expressly included the words).

Second, the legislative history demonstrates that Congress did not intend comparable education to require identical salaries. In 1959, the Comptroller General issued a decision holding that under section 241 as it existed at that time, the Army could not compensate West Point teachers according to teachers' salaries in a neighboring city. In response to the Army's legislative proposals to change this ruling, Congress amended section 241 in 1965 to provide: "For the purpose of providing such comparable education, personnel may be employed and the compensation, tenure, leave,

hours of work and other incidents of the employment relationship *may* be fixed without regard to the Civil Service Act and rules...." 20 U.S.C. § 241(a) (1974 & Supp. 1988) (emphasis added). By choosing the term "may," Congress did not require the military departments to establish compensation in accordance with local public schools, but merely gave military departments the discretion to deviate from the prevailing rate act and establish compensation in such manner.

A senate report similarly demonstrates that section 241 does not require comparable salaries. The senate report accompanying the 1965 amendment illustrates that Congress amended section 241 in response to the Army's request to compensate teachers comparable to the teaching profession rather than to local school practices. S.Rep. No. 311, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin. News 1910, 1913. The Army explained that the federal pay acts did not practically accommodate the teaching profession: teachers' salary schedules are set on a school-year basis while the federal pay acts set salaries on a calendar year; federal employees receive overtime pay but teachers receive fixed amounts for extracurricular activities; and teachers do not observe the forty-hour work week of most federal employees. *See* 1965 U.S.Code Cong. & Admin.News at 1913. Because of these differences, the Army concluded: "Based upon the Department's experience in operating [dependents] schools, it is highly desirable that the personnel practices for instructional personnel be patterned after those usually encountered in the teacher profession rather than those which have been developed for the Federal Service as a whole." 1965 U.S.Code Cong. & Admin. News at 1913. Thus, Congress amended section 241 to allow the Army to compensate its teachers in accordance with the entire teaching profession rather than mandating it to adhere to the local public schools' pay practices.

We conclude that section 241 does not compel the Army to follow local public schools' pay practices, therefore, the Army has discretion for setting the dependents schools' employees' salaries. Because the Army has such discretion, the Union's proposals do not conflict with or involve matters specifically set by law. Consequently, we hold that the Union's compensation and fringe benefits proposals involve conditions of employment subject to the duty to bargain.

B. *Compelling Need*

As stated above, no duty to bargain exists over proposals that conflict with an agency regulation for which a compelling need exists. 5 U.S.C. § 7117(a)(2) (1980). The Army contends that the Union's proposals conflict with Army Regulation 352–3,1–7 and that a compelling need exists for this regulation. This regulation requires the dependents schools' salary schedules to equal those of the local schools "to the maximum extent practicable."[6] Because some of the Union's proposals conflict with this regulation, we must decide whether a compelling need exists for this regulation.[7]

---

6. This regulation provides:

1–7. Comparison factors. Education provided pursuant to the provisions of Section 6 for children residing on Federal property will be considered comparable to free public education offered by selected communities of the State when the following factors are, to the maximum extent practicable, equal:

a. Qualifications of professional and nonprofessional personnel.

b. Pupil-teacher ratios.

c. Curriculum for grades offered, including kindergarten and summer school, if applicable.

d. Accreditation by State or other accrediting association.

e. Transportation services (student and support).

f. Length of regular and/or summer term(s).

g. Types and numbers of professional and nonprofessional positions.

h. Salary schedules.

i. Conditions of employment.

j. Instructional equipment and supplies.

Army Regulation AR 352–3, 1–7.

7. After deciding that no compelling need exists for the Army's regulation, the FLRA concluded that the Army did not show that Sections A through G, I and J of Proposal 1 conflicted with the regulation. Because we find that no compelling need exists for this regulation, we need

The FLRA and the Second Circuit have concluded that no compelling need exists for this regulation. A compelling need exists if the "rule or regulation is essential, as distinguished from helpful or desirable, to the accomplishment ... of functions of the [Army].... [or] the rule or regulation implements a mandate to the [Army] ... under law ... which implementation is essentially nondiscretionary in nature." 5 C.F.R. § 2424.11(a) & (c) (1986). We agree with the FLRA and the Second Circuit that Army Regulation 352–3, 1–7 does not "implement a mandate to the Army" because as discussed above, section 241 does not require the Army to compensate its school employees according to local public school practices. *Accord West Point Elementary School Teachers Assoc.*, at 943. Similarly, this regulation is not "essential" to the Army providing a comparable education at a comparable cost per pupil. As the Second Circuit recently concluded, the Army can achieve both of these goals notwithstanding large variations in the employees' wages because many expenses beyond their salaries enter into the per pupil expenditures. *West Point Elementary School Teachers Assoc.*, at 943. For example, books, building maintenance, athletic programs, clubs, and lunch services also enter into this calculation. Many factors other than teachers' compensation also affect the quality of education. Moreover, section 241 requires equality only to the maximum extent possible, not exact equality. Consequently, the Army has not established a compelling need for this regulation.

## C. *Army's Right to Set its Budget*

■ The Army finally contends that the Union's proposals infringe upon its right to set its budget. The FLRA concluded that the Army failed to demonstrate that the Union's proposals interfere with its right to determine its budget. We must give deference to the FLRA's decision because this decision involves the application of the FSLMRA. *See* 5 U.S.C. § 7106(a)(1) (Army has a right to set its budget); *see also Bureau of Alcohol, Tobacco and Firearms*

*v. FLRA*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (FLRA is entitled to considerable deference when it applies the FSLMRA to federal labor relations disputes). Further, we accept the FLRA's findings of fact because the record as a whole provides substantial evidence to support such findings. *See* 5 U.S.C. § 7123(c) (1980).

In *West Point,* the Second Circuit rejected the Army's contention that a salary proposal interfered with its right to set its budget. The court noted that the proposal did not specify particular salary figures and that the proposal would not necessarily increase the Army's costs. *West Point Elementary School Teachers Assoc.*, at 944. Consequently, the court deferred to the FLRA's decision that the proposal violated such right.

■ We similarly defer to the FLRA's decision that the Union's proposals do not invade the Army's right to make its budget. A proposal does not infringe on an agency's right to determine its budget merely because the proposed matter will increase the agency's costs. *AFGE and Air Force Logistics Command*, 2 F.L.R.A. at 607. Rather, an agency must show either that the proposals "(1) prescribe the particular programs or operations the agency would include in its budget or ... prescribe the amount to be allocated in the budget," or (2) would cause significant and unavoidable cost increases without creating any compensating benefits. *AFGE and Air Force Logistics Command*, 2 F.L.R.A. 604. The FLRA concluded that the Army did not demonstrate that the proposals would cause substantial and unavoidable cost increases.

The evidence supports this conclusion. The proposals would not necessarily increase the Army's costs; the Army did not specify any amount by which the proposed matters would increase its budget. Further, any increase in the employees' salaries would not significantly increase the Army's budget; the Army concedes that its budget includes bases, troops, weapons, vehicles, other equipment, salaries for all oth-

---

not address whether these sections conflict with     the Army regulation.

er officers, and expenses for its eight other schools. Finally, the Army did not establish that no compensating benefits would offset such costs even if its costs increased. Therefore, we defer to the FLRA's decision because the record supports the FLRA's conclusions and hold that the Army failed to establish that the Union's proposals would interfere with its right to determine its budget.

## CONCLUSION

For the above reasons, we hold that the Union's proposals concerning compensation and fringe benefits involve conditions of employment within the agency's discretion, creating a statutory duty to bargain. Furthermore, we conclude that the FLRA properly found that the Army did not establish a compelling need for its regulation. Finally, we hold that the FLRA properly held that the Union's proposals did not interfere with the Army's right to determine its own budget. Consequently, we grant the FLRA's and the Union's petition to enforce the FLRA's order, and we deny the Army's petition for review.

AFFIRMED.

## APPENDIX A

### Proposal 1

Article 25: Salary and Benefits

A. The salary schedule shall be subject to annual review beginning approximately the 15th of December of each year. The Association shall be consulted in the review. Employer will maintain salaries on a competitive level with comparable school districts. The comparable school districts which shall be used for salary and fringe benefits comparison purposes shall be Liberty and Chatham Counties and Atlanta City Schools.

B. The ceiling for years of experience shall be extended from 16 to 20 years.

C. Pay lanes of the salary schedule shall be established for each category of teachers at Fort Stewart Schools justified by the results of a wage survey system conducted by the Employer.

D. A copy of all data collected shall be provided to the Association for independent analysis. The Employer shall consult the Association to explain its analysis and attempt to resolve any differences of opinion before the salary schedule is developed.

E. All increases on the salary schedule shall be applied across the board.

F. The salary schedule shall reflect the cost of living increase no later than thirty (30) days after it is released by the Federal government.

G. Completion of Higher Level Education.

1. A teacher who completes the advanced education required to qualify for a salary under a higher education salary schedule shall be assigned the higher salary rate retroactive to the 1st day of the school year preceding the date the education was completed. Such adjustment shall be made upon receipt of written documentation in which the college or university concerned specifies the date when the teacher completed the advanced education, or the date when the teacher met the requirements for a specific degree.

H. Maintain procedure for development of salary schedule for all unit members who are on the civil service pay scales.

I. Summer school salaries shall be based on the unit member's regular hourly rate of pay.

J. Any unit member whose employment is terminated by the Employer will be given a lump sum payment for unused sick leave.

K. Mileage Reimbursement

The use of personally owned vehicles for authorized school business shall be reimbursed at the rate of 40 cents per mile.

L. Health Insurance

The Employer shall pay the full amount of health insurance premium for each unit member who elects to participate in the health insurance program. The Employer will pay the premium for the family coverage portion in the health benefit program if the unit member desires this additional coverage.

M.  Life Insurance Benefit

The Employer shall pay the full amount of life insurance premium for each unit member. The coverage shall be the basic life insurance plan. Unit members shall have the option to pay the premiums for any additional insurance options elected.

N.  Unit members will continue to receive all health benefits currently held which have not been specifically enumerated in previous articles of this Agreement.

O.  Any subsequent benefits provided to the Federal service in health benefits, insurance benefits, disability and retirement, sick leave, and workers compensation shall automatically accrue to the unit members.

## APPENDIX B

### Proposal 3

Article 11:  Leave

*Section 1.* Sick and annual leave for Unit Members whose services are required for twelve (12) months will accrue and be granted in accordance with the Annual and Sick Leave Act of 1951, as amended 5 USC Chapter 63 and applicable Civilian Personnel Regulations.

*Section 2.* Sick leave, annual leave, administrative, and other types of leave for those Unit Members whose services are not required for twelve (12) months will be administered as follows:

A.  *Sick Leave.* Unit members shall accumulate sick leave at a rate of four (4) hours per pay period not to exceed thirteen (13) days shall be accredited to Unit Members at the beginning of the school year. Sick leave will accumulate without limit and can be taken for any time during the school year, but payment for sick leave taken in excess of that earned will be recovered. No accrued sick leave shall be carried over to any succeeding period when there is a break in federal employment in excess of three (3) continuous years.

1.  Sick leave will be granted for the following purposes:

(a) medical, dental or optical examination or treatment;

(b) sickness or injury;

(c) medical disability connected with pregnancy;

(d) exposure to a contagious disease;

(e) illness of a member of the immediate family or near relative who resides in the same household or for whom the employee is financially responsible;

(f) death of an immediate family member or near relative.

2.  As used in this section, immediate family shall mean spouse, grandparent, parent-in-law, child, grandchild, or sibling.  Near relative shall include immediate family and extend to first cousin, aunt, uncle, niece, nephew, brother-in-law, daughter-in-law, or son-in-law.

3.  In the cases requiring a substitute teacher, absence chargeable to sick leave will be for not less than four (4) hours. When no substitute is employed, sick leave will be taken in multiples of one hour. The decision as to whether a substitute is required shall be made solely by management officials.

4.  Unit members must obtain approval from the principal before sick leave that has not been accrued can be used.

5.  Unit members may be required to provide a doctor's statement in the case of a period of absence which exceeds five (5) consecutive days.

6.  Upon retirement, credit for unused sick leave shall be administered in accordance with FPM Supplement 831-1 Subchapter S3-7.

7.  The Employer and Association shall meet by November fifteen (15) to discuss the establishment of a sick leave bank.

B.  *Personal Leave*

1.  During any school year, a unit member may utilize up to a maximum of three days of accumulated sick leave for personal reasons. Notification of the use of such leave will be made one (1) day in advance. Two (2) days of personal leave may be carried over to the next year for a maximum of five (5) personal days.

2. No personal leave will be taken on the day before or immediately after spring vacation, testing days, nor on inservice days or conference days unless such leave has been approved by the Superintendent.

3. Personal leave will be for not less than four (4) hours in those cases where a substitute teacher is employed. When no substitute is employed, personal leave will be taken in multiples of one hours. The decision as to whether a substitute is required shall be made solely by management officials.

C. *Professional Leave of Absence.* Professional leave of absence may be granted by the Employer subject to the following:

1. After five (5) years of continuous service at Fort Stewart, sabbatical leave of absence without pay may be granted for up to one (1) employee per school year at the discretion of the Employer. Such leave shall be granted for the purpose of advanced study, research, professional writing, or other experience of recognized value in an employee's restrictive field.

2. Applications will be submitted to the Superintendent of Schools not later than 1 April of the school year prior to the year the leave is to be taken. Applications will include:

(a) reason for leave;

(b) proposed length of time;

(c) where leave will be spent;

(d) outline of studies or activities to be taken.

3. Professional leave of absence will normally be granted for one (1) school year. Leave may be granted for a semester.

4. While in a leave status, employees will not be eligible to accrue sick leave but will be entitled upon return to duty to any sick leave accrued prior to the professional leave. Upon return to duty, the employee will be entitled to advance one (1) step on the salary schedule, if the studies or activities as proposed when the leave was granted have been completed.

5. Unit members will not accrue seniority but will be entitled to return to duty any seniority accrued prior to the professional leave.

6. While in a leave status employees may continue their participation in the health and life insurance programs by payment of required premiums.

7. Unit members may utilize up to a maximum of five (5) days with pay per school year for education related purposes, such as school visitations, conferences, and workshops. Approval for the above leave shall be granted by the Superintendent.

D. *Court Leave.* Employees serving on jury duty or subpoenaed to court shall be carried on court leave without financial loss or loss of sick or annual leave.

1. An employee on court leave may not receive fees for jury service on regular workdays in a Federal court. The employees may receive and retain fees for such duty performed on nonworkdays or on holidays on which the employee would otherwise have been excused from work.

2. An employee on court leave will accept fees received from state or municipal courts and turn them in to the Civilian Pay Section of Fort Stewart Finance and Accounting Office. The employee may retain pay received for travel and subsistence expenses. Fees received for jury duty service performed outside normal duty hours or on holiday on which the employee would otherwise have been excused may be retained.

E. *Maternity/Paternity/Adoption Leave.* Maternity, paternity, and adoption leave will be administered as follows:

1. For female employees having a child, accumulated sick leave may be used one and one half (1½) months prior to having the child upon presentation of a certificate of incapacity. Once the child is delivered the employee may use sick leave up to a period of one and one half (1½) months after the child is delivered. Once the one and one half (1½) months of sick leave have been exhausted and the employee still desires further time away from work, the employee will be granted leave without pay. In no case will leave without pay be granted for more than one (1) year.

2. For male employees who desire to stay at home with their child, leave without pay may be granted for a period not to exceed one (1) year. A male employee may also make use of personal leave (see Section 1, paragraph b of this Article) for paternity leave.

3. For any employee who desires to stay at home with an adopted child, leave without pay may be granted for a period not to exceed one (1) year. Leave without pay may be taken prior to finalization of the adoption if such leave is necessary to take part in court proceeding or other action relating to the adoption. Personal Leave (Section 1, paragraph b of this Article) may also be utilized.

4. An employee shall make known intent to request leave including the type of leave, approximate dates, and anticipated duration to allow the Employer to prepare for any staffing adjustments which may be necessary.

F. *Leave Without Pay (LWOP)*

1. LWOP is requested by an employee and may be approved at the discretion of the immediate supervisor.

2. Leave without pay may be granted to unit members for the following reasons:

(a) education leave or travel;

(b) such other reasons as are approved by the Superintendent

3. The minimum charge of LWOP is one (1) hour and additional charges in multiples of one (1) hour.

4. Maximum amount of LWOP that may be taken during one (1) school year is one (1) month except as provided in Section 1, paragraph 3 (Maternity/Paternity/Adoption Leave).