**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

NO. 93-8477

YSLETA DEL SUR PUEBLO,

Plaintiff-Appellee,

VERSUS

STATE OF TEXAS and ANN RICHARDS, Governor,

Defendants-Appellants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONSOLIDATED WITH

NO. 93-8823

YSLETA DEL SUR PUEBLO,

Plaintiff-Appellee,

VERSUS

STATE OF TEXAS and ANN RICHARDS, Governor,

Defendants-Appellants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NO. 94-50130

YSLETA DEL SUR PUEBLO,

Plaintiff-Appellee,

VERSUS

STATE OF TEXAS and ANN RICHARDS, Governor,

Defendants-Appellants.

Appeals from the United States District Court
for the Western District of Texas

(October 24, 1994)

Before REYNALDO G. GARZA, DeMOSS, and PARKER, Circuit Judges.

DeMOSS, Circuit Judge:

Pursuant to the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701-21, the Ysleta del Sur Pueblo ("Tribe"), a federally recognized Indian tribe located near El Paso, Texas, sued the state of Texas ("State") and its governor for refusing to negotiate a compact that would permit the Tribe to engage in casino-type gambling on its reservation. Having concluded that neither IGRA nor the Restoration Act, 25 U.S.C. § 1300g, barred the Tribe from engaging in such gambling, the district court granted the Tribe summary judgment. We hold that the Restoration Act, not IGRA, governs this dispute and does not give the Tribe the right to sue

2

the State in federal court. We therefore reverse the district court's summary judgment for the Tribe and remand with instructions to dismiss the Tribe's suit.

## I.

Before analyzing the State's appeals, we first provide some background on the Restoration Act, IGRA, and the procedural history of this case.

## A.

In 1968, the federal government recognized the Tiwa Indians[1] of the Ysleta del Sur Pueblo as an Indian tribe but simultaneously transferred responsibility for the Indians to the state of Texas. See Tiwa Indians Act, Pub. L. No. 90-287, 82 Stat. 93 (1968). Although the Tiwa Indians Act constituted legal recognition of the Indians, it had no practical effect on the relationship between the federal government and the Tribe because "[t]he Tribe had not been subject to federal supervision and had received no federal Indian services before the 1968 Act, and that status continue [sic] after its enactment." S. REP. NO. 90, 100th Cong., 1st Sess. 7 (1987). Instead, Texas administered the Tribe's affairs, which included holding the Tribe's 100-acre reservation in trust and providing economic development funds to the Tribe. H.R. REP. NO. 36, 100th Cong., 1st Sess. 2 (1987). Furthermore, the Tiwa Indians Act expressly recognized that the Tiwa Indians were "subject to all

---

[1]Prior to passage of the Restoration Act, the Ysleta del Sur Pueblo were known as the Tiwa Indians. Section 102 of the Restoration Act officially changed the name of the Tribe. 25 U.S.C. § 1300g-1.

3

obligations and duties [as] citizens under the laws of the [s]tate of Texas."  See Tiwa Indians Act.

In 1983, however, Texas became concerned that its trust relationship with the Tribe violated state constitutional law. H.R. REP. NO. 36, at 2.  Consequently, the United States and the Tribe began the process of granting the Tribe federal trust status. In December 1985, the House of Representatives of the 99th Congress passed H.R. 1344, a bill to restore the trust relationship between the United States and the Tribe.  With regard to gaming activities, § 107 of H.R. 1344 provided:

> Gaming, lottery or bingo on the tribe's reservation and on tribal lands shall only be conducted pursuant to a tribal ordinance or law approved by the Secretary of the Interior. Until amended as provided below, the tribal gaming laws, regulations and licensing requirements shall be identical to the laws and regulations of the State of Texas regarding gambling, lottery and bingo.

131 CONG. REC. H12012 (daily ed. Dec. 16, 1985) (text of H.R. 1344 as passed by the House).  Notwithstanding § 107, various state officials and members of Texas' congressional delegation still were concerned that H.R. 1344 did not provide adequate protection against high stakes gaming operations on the Tribe's reservation. Believing that restoration of their federal trust status was more important than exercising the option to operate gaming operations, the Tribe approved Resolution No. TC-02-86 in March 1986.[2]  The

---

[2]Because of its critical importance to our resolution of this case, we re-print, with emphasis in certain portions, Resolution No. TC-02-86:

> WHEREAS, on December 16, 1985, the United States House of Representatives passed H. R. 1344, a bill to provide for the restoration of the federal trust relationship to the Ysleta

4

del Sur Pueblo (Tigua Indian Tribe of Texas), and H. R. 1344 is now before the United States Senate for consideration; and,

WHEREAS, after hearings on H. R. 1344 before the House Committee on Interior and Insular Affairs on October 17, 1985, the Comptroller of Public Accounts for the State of Texas raised concerns that H. R. 1344 would permit the Tribe to conduct high stakes gambling and bingo operations to the detriment of existing charitable bingo operations in the State of Texas; and,

WHEREAS, the Comptroller urged members of the Texas Congressional Delegation to defeat H. R. 1344 unless the bill was amended to provide for direct application of state laws governing gaming and bingo on the reservation; and,

WHEREAS, the Ysleta del Sur Pueblo has no interest in conducting high stakes bingo or other gambling operations on its reservation, regardless of whether such activities would be governed by tribal law, state law or federal law; and,

WHEREAS, in response to the concerns voiced by the Comptroller and other officials, the Tribe attempted to insure that H. R. 1344 would give the Tribe no competitive advantage in gaming operations by agreeing to amend H. R. 1344 to provide that any gaming activities on the reservation would be conducted pursuant to tribal law that would be required to be identical to state law, and H. R. 1344 was so amended by the House Interior committee; and,

WHEREAS, some state officials and members of the Texas congressional delegation continue to express concern that H. R. 1344, as amended, does not provide adequate protection against high stakes gaming operations on the reservation; and,

WHEREAS, the proposal that H. R. 1344 be amended to make state gaming law applicable on the reservation continues to be wholly unsatisfactory to the Tribe in that it represents a substantial infringement upon the Tribes' power of self government, is inconsistent with the central purposes of restoration of the federal trust relationship, and would set a potentially dangerous precedent for other tribes who desire to operate gaming facilities and are presently resisting attempts by State to apply their law to reservation gaming activities; and,

WHEREAS, the Ysleta del Sur Pueblo remains firm in its commitment to prohibit outright any gambling or bingo in any form on its reservation; and,

5

resolution represented a political accommodation between the Tribe, the state of Texas, and various members of Texas' congressional delegation. The Tribe clearly viewed the applicability of state gaming laws on its reservation as an infringement on its sovereignty. But to ensure passage of the restoration legislation, the Tribe urged Congress to adopt "language which would provide that all gaming, gambling, lottery, or bingo, as defined by the laws and administrative regulations of the State of Texas, shall be prohibited on the Tribe's reservation or on tribal land." The distinction between the language in § 107, as passed by the House, and the Tribe's suggested language is that § 107 provided the Tribe with the option to deviate from Texas' gaming laws _if_ the Tribe petitioned the secretary of Interior, the secretary approved, and Congress did not overrule the secretary. The Tribe's suggested language, on the other hand, established that Texas law with regard to gaming would effectively operate as surrogate federal law. The

---

WHEREAS, although the Tribe, as a matter of principle, sees no justification for singling out the Texas Tribes for treatment different than that accorded other Tribes in this country, the Tribe strongly believes that the controversy over gaming must not be permitted to jeopardize this important legislation, the purpose of which is to ensure the Tribe's survival, protect the Tribe's ancestral homelands and provide the Tribe with additional tools to become economically and socially self-sufficient;

NOW, THEREFORE, BE IT RESOLVED, that the Ysleta del Sur Pueblo respectfully requests its representatives in the United States [Senate] and House of Representatives to amend [§ 107(a) of the Restoration Act] by striking all of that section as passed by the House of Representatives and substituting in its place language which would provide that all gaming, gambling, lottery, or bingo, as defined by the laws and administrative regulations of the State of Texas, shall be prohibited on the Tribe's reservation or on tribal land.

6

resolution also clearly indicates that the Tribe, at the time of the resolution's adoption, "ha[d] no interest in conducting high stakes bingo or other gambling operations on its reservation" and "remain[ed] firm in its commitment to prohibit outright any gambling or bingo in any form on its reservation."

The Senate of the 99th Congress incorporated the Tribe's suggested language. Section 107 of H.R. 1344, as passed by the Senate in September 1986, provided that "[g]aming, gambling, lottery or bingo as defined by the laws and administrative regulations of the State of Texas is hereby prohibited on the tribe's reservation and on tribal lands." 132 CONG. REC. S13634 (daily ed. Sept. 25, 1986) (text of H.R. 1344 as passed by the Senate). Shortly thereafter, however, the Senate vitiated action on H.R. 1344, see 132 CONG. REC. S13735 (daily ed. Sept. 25, 1986), whereupon the bill died.

The restoration legislation was reintroduced as H.R. 318 in the 100th Congress, and the House passed the bill in April 1987. Section 107 of H.R. 318 provided that, "[p]ursuant to Tribal Resolution T.C.-02-86 which was approved and certified on March 12, 1986, all gaming as defined by the laws of the State of Texas shall be prohibited on the tribal reservation and on tribal land." 133 CONG. REC. H2051 (daily ed. April 21, 1987) (text of H.R. 318 as passed by the House). The Senate approved H.R. 318 in July 1987. The Senate amended § 107 to read:

> All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe. Any violation of the prohibition provided in this subsection shall be subject to the same civil and

7

criminal penalties that are provided by the laws of the State of Texas.  The provisions of this subsection are enacted in accordance with the tribe's request in Tribal Resolution No. T.C.-02-86 which was approved and certified on March 12, 1986.

133 CONG. REC. S10568 (daily ed. July 23, 1987) (text of H.R. 318 as passed by the Senate).  According to the Senate Report accompanying the legislation, the only difference between § 107 as passed by the Senate and § 107 as passed by the House was that the Senate version "expand[s] on the House version to provide that anyone who violates the federal ban on gaming contained in [§ 107] will be subject to the same civil and criminal penalties that are provided under Texas law."    S. REP. NO. 90, 100th Cong., 1st Sess. 8-9 (1987). Otherwise, the report stated, the "central purpose" of the two versions was the same: "to ban gaming on the reservations as a matter of federal law."  Id. at 8.  The House concurred in the Senate's amendments in August 1987, see 133 CONG. REC. H6972 (daily ed. Aug. 3, 1987), whereupon H.R. 318 became public law 100-89. Section 107 of the Restoration Act is now codified at 25 U.S.C. § 1300g-6.[3]

---

[3]The Restoration Act restored not only the Ysleta del Sur Pueblo's federal trust status but also the federal trust status of the Alabama and Coushatta Indian tribes.  The Act has two titles. Title I, 25 U.S.C. § 1300g, concerns the Ysleta del Sur Pueblo, and Title II, 25 U.S.C. §§ 731-37, concerns the Alabama and Coushatta Indian tribes.  The two titles are nearly identical, particularly with regard to the sections concerning gaming.  It is important to note that the Alabama and Coushatta Indian tribes are not parties to this suit.  In fact, these tribes recently voted to not engage in casino-style gambling on their reservation.  See Dianna Hunt, Indians Defeat Plan for Casino on Reservation, HOUSTON CHRON., June 16, 1994, at 1A.

8

B.

In the midst of the 100th Congress' deliberations over the Restoration Act, the Supreme Court issued its opinion in California v. Cabazon Band of Mission Indians, 480 U.S. 202 (1987). In that case, two Indian tribes located in California were sponsoring unregulated gaming activities on their reservations.[4] The state of California attempted to enforce against the tribes a state statute regulating bingo operations. The tribes sued, asserting that California had no authority to enforce its gambling laws and regulations on tribal reservations because the United States, which has plenary power over Indian affairs, had not authorized California to do so. California argued that, pursuant to Public Law 280 of 1953,[5] the United States had expressly authorized California to enforce its bingo statute against the tribes. Public Law 280 specifically granted California authority to (1) enforce its criminal laws on Indian reservations,[6] and (2) hear in its courts civil causes of action in which an Indian is a party.[7] California argued in Cabazon Band that its bingo statute was a criminal law which could be enforced on Indian reservations.[8]

---

[4]The California tribes were sponsoring bingo, draw poker, and other card games.

[5]See Pub. L. No. 83-280, ch. 505, §§ 2 & 4, 67 Stat. 588 (1953) (codified at 18 U.S.C. § 1162(a) and 28 U.S.C. § 1360(a) respectively).

[6]Id. § 2 (codified at 18 U.S.C. § 1162(a)).

[7]Id. § 4 (codified at 28 U.S.C. § 1360(a)).

[8]In addition to California, Public law 280 applied to five other states: Alaska, Minnesota, Nebraska, Oregon, and Wisconsin.

9

The Supreme Court disagreed. The Court began by noting that, while Public Law 280 broadened California's authority with regard to Indian reservations, Congress did not intend to grant it general civil regulatory authority. Public Law 280, the Court reasoned, was narrowly tailored to combat lawlessness on reservations and not "to effect total assimilation of Indian tribes into mainstream American society." Cabazon Band, 480 U.S. at 207-08. Thus, according to the Court, when a state invokes Public Law 280 to enforce its laws, it must be determined whether the law is "criminal" in nature, and therefore applicable, or "civil" in nature, and therefore inapplicable except when the law is relevant to private civil litigation in state court. The question of whether a law is criminal or civil, in turn, depends on the law's practical effect. That is, a state law is criminal, and thus applicable under Public Law 280, if it generally prohibits certain conduct, but a state law is civil, and presumptively inapplicable, if it regulates the conduct at issue. Cabazon Band, 480 U.S. at 209-10.

Applying the criminal-prohibitory/civil-regulatory dichotomy,[9] the Court rejected California's claim that its bingo statute was criminal in nature on the basis that the statute is not a general prohibition on certain conduct. Instead, "the state law generally

---

[9]The Court noted that this Circuit originally enunciated the dichotomy in Seminole Tribe of Florida v. Butterworth, 658 F.2d 310 (5th Cir. 1981). Cabazon Band, 480 U.S. at 209-10.

permits the conduct at issue, subject to regulation."[10] Id. at 209. The Court analogized California's bingo statute to the state's other gambling statutes, all of which regulate (rather than prohibit) the relevant conduct.[11] The Court concluded that, given the extent to which the state currently regulated gambling, California had no public policy against bingo in particular or gambling in general. Id. at 211. California therefore could not prohibit the tribes from offering the gaming activities on their reservations.

Cabazon Band led to an explosion in unregulated gaming on Indian reservations located in states that, like California, did not prohibit gaming. While Congress recognized that the growth in gaming generated substantial revenues for the tribes and, hence, fostered tribal autonomy, it nonetheless became concerned that unregulated growth might invite criminal elements. In 1988, Congress therefore enacted the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701-21. IGRA was intended to balance the right of tribes to self-government with the need "to protect both the tribes and the gaming public from unscrupulous persons." See generally S. REP. NO. 446, 100th Cong., 2d Sess. 1-3 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3071-73.

---

[10]The statute in particular required bingo games to be operated by unpaid members of designated charitable organizations. In addition, it limited prizes to $250 and required profits to be used for charitable purposes. CAL. PENAL CODE § 326.5 (1987).

[11]In addition to bingo, California permits, with certain regulatory constraints, a lottery, pari-mutuel betting on horse races, and card games. Cabazon Band, 480 U.S. at 210-11.

IGRA establishes three distinct classes of gaming -- Class I, Class II, and Class III -- each with its own degree of regulation. IGRA defines Class I gaming as social games typically offered at traditional Indian ceremonies. 25 U.S.C. § 2703(6). IGRA expressly states that it does not regulate Class I gaming. Id. § 2710(a)(1). IGRA defines Class II gaming as bingo and non-banking card games (i.e., card games in which the casino has no economic interest in the outcome). Id. § 2710(7)(A). IGRA provides that a tribe may engage in Class II gaming so long as the state in which the tribe is located "permits" such gaming. Id. § 2710(b)(1). Finally, IGRA defines Class III gaming as all other forms of gaming, id. § 2703(8), particularly the lucrative casino-style games such as blackjack, slot machines, roulette and baccarat. See S. REP. NO. 446 at 3, 7. IGRA places two important conditions on Class III gaming. First, just as it does with Class II gaming, IGRA establishes that a tribe may engage in Class III gaming so long as the state in which the tribe is located "permits" such gaming. 25 U.S.C. § 2710(d)(1)(B). Second, IGRA requires a tribe that seeks to engage in Class III gaming to negotiate a compact with the state in which it is located. Id. § 2710(d)(1)(C). Congress viewed tribal-state compacts as the most effective means of balancing tribal sovereignty with the states' need to protect the public against the risks typically associated with Class III-type gaming. S. REP. NO. 446 at 13-14. If a state refuses to negotiate a compact with a tribe, IGRA permits the tribe to sue the state in federal court. 25 U.S.C. § 2710(d)(7)(A)(i).

C.

Pursuant to IGRA, the Ysleta del Sur Pueblo petitioned the governor of Texas in February 1992 to begin negotiations to enter into a tribal-State compact.[12]  Governor Ann Richards took the position that she could not negotiate a compact for the proposed gaming activities because Texas law and public policy forbid such gaming activities.  The tribe therefore sued the State in April 1993.  In May 1993, The State moved to dismiss on the grounds that the Eleventh and Tenth Amendments barred the suit.  The district court denied the State's motion in June 1993, and the State appealed in July 1993.  The State's appeal from the district court's denial of the motion to dismiss (No. 93-8477) represents the first of three appeals in this case.

After we denied a motion to stay the proceedings pending resolution of the State's first appeal,[13] the parties returned to district court.  In September 1993, the Tribe and the State each filed motions for summary judgment.  The parties' motions primarily focused on a host of detailed IGRA-related questions, such as whether Texas law currently "permits" Class III games to be played. The parties also raised the issue of whether the Restoration Act independently bars the Tribe from engaging in Class III-type

---

[12]The Tribe specifically proposed baccarat, blackjack, craps, roulette and slot machines, which hereinafter will be referred to collectively as "proposed gaming activities."

[13]The motion to stay was filed along with the first appeal. We denied the motion in August 1993, with the caveat that the governor could not be subject to process in the district court during the pendency of the State's first appeal.

13

gaming. In November 1993, the district court granted the Tribe summary judgment. <u>Ysleta del Sur Pueblo v. State of Texas</u>, 852 F. Supp. 587 (W.D. Tex. 1993). The court found that Texas effectively "permits" the Class III games in which the Tribe is seeking to engage, and that therefore Texas could not refuse to negotiate a tribal-state compact. <u>Id</u>. at 590-96. The court also found that the Restoration Act <u>does not</u> serve as an independent bar to the Tribe's gaming plans. <u>Id</u>. at 597.

In response to the court's summary judgment for the Tribe, the State filed its second appeal (No. 93-8823) in November 1993. The State again moved for a stay in the proceedings pending resolution of this latest appeal. Instead of granting a stay, we consolidated the State's two appeals in January 1994 and expedited their consideration. Meanwhile, the Tribe, in response to the State's second appeal, filed with this court a motion to dismiss that appeal for lack of jurisdiction. The Tribe argued that, absent the appointment of a mediator,[14] the district court's summary judgment for the Tribe was not a final judgment for purposes of 28 U.S.C. § 1291. The Tribe's motion, however, was subsequently rendered moot when the district court appointed a mediator in February 1994. To ensure that its second appeal was properly preserved, the State formally appealed the court's appointment of a mediator. We

_____

[14]IGRA provides that, if a tribe and a state fail to reach a compact within the sixty-day period following a court order to do so, the court is empowered to appoint a mediator to choose between each party's "last best offer for a compact." 25 U.S.C. § 2710(d)(7)(B)(iv).

14

consolidated the State's third appeal (No. 94-50130) with its remaining two (Nos. 93-8477 & 93-8823).

## II.

Our sister circuits have split on the issue of whether IGRA constitutionally permits an Indian tribe to sue a state. Compare Seminole Tribe of Florida v. State of Florida, 11 F.3d 1016, 1026-28 (11th Cir. 1994) with Cheyenne River Sioux Tribe v. State of South Dakota, 3 F.3d 273, 280-81 (8th Cir. 1993).[15] The State has appealed precisely the same issue. However, as is apparent below, our resolution of the State's second appeal renders this issue moot. Mindful that we should not reach constitutional issues when a case can be resolved on other grounds, we will merely assume, without deciding, that Congress did not exceed its constitutional authority when it enacted IGRA.

## III.

We now consider the State's two remaining appeals (Nos. 93-8823 & 94-50130), both of which essentially appeal the district court's order granting summary judgment in favor of the Tribe and denying the State's cross-motion for summary judgment. In their respective motions for summary judgment, the parties devoted most of their discussion to IGRA-related questions. The parties addressed the issue of whether Texas law "permits" the Tribe's

---

[15]See also William T. Bisset, Tribal-State Gaming Compacts: The Constitutionality of the Indian Gaming Regulatory Act, 21 HASTINGS CONST. L.Q. 71, 76-92 (1993); Joseph J. Weissman, Note, Upping the Ante: Allowing Indian Tribes to Sue States in Federal Court Under the Indian Gaming Regulatory Act, 62 GEO. WASH. L. REV. 123, 133-61 (1993).

proposed gaming activities to be played "for any purpose by any person." 25 U.S.C. § 2710(d)(1)(B). Texas, of course, argued that its laws and public policy prohibit the Tribe's proposed gaming activities, whereas the Tribe argued the exact opposite. The State alternatively argued that the Restoration Act independently bars the Tribe from engaging in its proposed gaming activities. The Tribe argued that under either IGRA or the Restoration Act, the analysis and the conclusion are the same: Texas law does not prohibit the proposed gaming activities, and therefore Texas cannot bar the Tribe from engaging in them. As to both IGRA and the Restoration Act, the district court agreed with the Tribe and granted its motion for summary judgment. See Ysleta, 852 F. Supp. at 590-97. We conclude that (1) the Restoration Act and IGRA establish different regulatory regimes with regard to gaming, (2) the Restoration Act prevails over IGRA when gaming activities proposed by the Ysleta del Sur Pueblo are at issue, and (3) the Tribe's suit is barred because the Restoration Act did not even attempt to abrogate the State's Eleventh Amendment immunity.

A.

The Tribe insists that, under either IGRA or the Restoration Act, the analysis for determining whether the Tribe's proposed gaming activities are allowed is the same. Specifically, it insists that § 107(a) of the Restoration Act does not operate as an independent bar to its proposed gaming activities because Texas does not "prohibit" the proposed gaming activities. The first sentence of § 107(a) of the Restoration Act provides: "All gaming

16

activities which are prohibited by the laws of the State of Texas are prohibited on the reservation and on lands of the tribe."  25 U.S.C. § 1300g-6.  The Tribe maintains that the term "prohibit" has special significance in federal Indian law, which is derived from Cabazon Band; and whether a federal court is interpreting IGRA or the Restoration Act, it should apply the same analysis, i.e., the Cabazon Band criminal-prohibitory/civil-regulatory dichotomy. Thus, according to the Tribe, the critical question under either IGRA or the Restoration Act is whether Texas law and public policy "prohibit" (that is, criminalize rather than regulate) the proposed gaming activities.[16]

The Tribe argues that Texas does not prohibit the Tribe's proposed gaming activities by pointing to the State's broad definition of a lottery:  "`Lottery' means the procedures operated by the state under this chapter through which prizes are awarded or distributed by chance among persons who have paid, or unconditionally agreed to pay, for a chance or other opportunity to receive a prize."  TEX. GOV'T. CODE ANN. § 466.002(3) (Vernon Supp. 1994).  The Tribe contends that its proposed gaming activities fall within the State's definition of lottery.  That is, like a lottery, the Tribe's proposed gaming activities (i.e., baccarat, blackjack, craps, roulette and slot machines) are all games of prize, chance and consideration.  Because the State permits one type of game

---

[16]The Tribe contends that both IGRA and the Restoration Act incorporated the Cabazon Band rationale because both statutes were passed by the same committees in each chamber at roughly the same time.

17

where the elements are prize, chance and consideration, the State no longer prohibits any other games with the same elements. The State, instead, merely regulates them. Consequently, according to the Tribe, § 107(a) of the Restoration Act does not act as an independent bar to the Tribe's proposed gaming activities.

The Tribe's argument is appealing only because § 107(a) of the Restoration Act uses the word "prohibit." But our analysis of the legislative history of both the Restoration Act and IGRA leads us to a conclusion contrary to that sought by the Tribe. When it passed IGRA, Congress indicated that, when determining whether Class II games are "prohibited" in certain states, federal courts should rely on Cabazon Band's criminal-prohibitory/civil-regulatory distinction.[17] No such express recognition of Cabazon Band appears in the committee reports accompanying the Restoration Act. Rather, in considering the Restoration Act, Congress clearly was concerned with enacting the compromise between the Tribe, the State and various members of the Texas congressional delegation. Congress specifically drafted § 107(a) "in accordance with the tribe's

---

[17]In the committee report accompanying IGRA, Congress stated that:
> Federal courts will rely on the distinction between State criminal laws which prohibit certain activities and the civil laws of a State which impose a regulatory scheme upon those activities to determine whether class II games are allowed in certain States. This distinction has been discussed by the Federal courts many times, most recently by the Supreme Court in Cabazon.

S. REP. No. 446 at 6. Thus, while Congress was specific as to Cabazon Band's application to Class II gaming, Congress left open the question as to whether that case applied to Class III gaming. Because we conclude that the Restoration Act clearly does not incorporate Cabazon Band, we leave open the question of whether IGRA incorporates Cabazon Band with regard to Class III gaming.

18

request in tribal Resolution No. T.C.-02-86." 25 U.S.C. 1300g-6(a). That resolution is crystal clear. The Tribe, in response to the concerns of Texas officials and various members of the State's congressional delegation, petitioned Congress to adopt "language which would provide that all gaming, gambling, lottery, or bingo, as defined by the laws and administrative regulations of the State of Texas, shall be prohibited on the Tribe's reservation or on tribal land." Congress acquiesced, and in so doing, spelled out the purpose of § 107(a): "[t]his section provides that gambling, lottery or bingo <u>as defined by the laws and administrative regulations</u> of the State of Texas is prohibited on the tribe's reservation and on tribal lands." S. REP. NO. 90 at 10 (emphasis added). The report's reference to both the laws <u>and</u> administrative regulations of Texas is clearly inconsistent with a contention that the Tribe and Congress contemplated that the prohibitory-regulatory distinction of <u>Cabazon Band</u> would be involved in analyzing the Restoration Act. Furthermore, as a means of enforcing those laws and regulations, Congress provided in § 107(a) that "[a]ny violation of the prohibition provided in this subsection shall be subject to <u>the same civil and criminal penalties</u> that are provided by the laws of the State of Texas." 25 U.S.C. § 1300g-6(a) (emphasis added). Again, if Congress intended for the <u>Cabazon Band</u> analysis to control, why would it provide that one who violates a certain gaming prohibition is subject to a <u>civil</u> penalty? We thus conclude that Congress did not enact the Restoration Act with an

19

eye towards <u>Cabazon Band</u>.[18]  Congress was merely acceding to the Tribe's request that the tribal resolution be codified.  <u>See</u> S. Rᴇᴘ. Nᴏ. 90 at 8 (the Tribe, "by formal resolution, requested that this legislation incorporate [its] existing law and custom that forbids gambling").[19]

The Tribe points to two items in the Restoration Act's legislative history that it believes indicates Congress incorporated <u>Cabazon Band</u> into § 107(a) of the Act.  First, Congress noted in its report that § 107(b) "is a restatement of the law as provided in [Public Law 280]."  <u>Id</u>. at 10.  The reference to Public Law 280, the statute at issue in <u>Cabazon Band</u>, presumably is the hook on which the Tribe hangs this argument.  The Tribe's argument, however, misses the mark, because § 107(b), as opposed to § 107(a), states only that the Restoration Act is not to be construed as a grant of civil or criminal regulatory jurisdiction to the State.  In that sense <u>only</u>, § 107(b) is a restatement of Public Law 280.  But it is § 107(a) that determines whether Texas "prohibits" certain gaming activities, and § 107(a) is <u>not</u> a restatement of Public Law 280.

The Tribe's second argument admittedly raises a closer question.  In August 1987, as the Restoration Act was on the brink

---

[18]Our conclusion is buttressed by the fact that the Restoration Act, which (like IGRA) was enacted after <u>Cabazon Band</u> was decided, makes no reference to the case, whereas IGRA does.  <u>See</u> S. Rᴇᴘ. Nᴏ. 446 at 6.  We take IGRA's reference to <u>Cabazon Band</u> as evidence that Congress knew how to incorporate the case when it so intended.

[19]The report also states that the "central purpose" of § 107(a) is "to ban gaming on the reservations as a matter of federal law." S. Rᴇᴘ. Nᴏ. 90 at 8.

of final passage in the House of Representatives, a member made the following statement on the floor of the House:

> It is my understanding that the Senate amendments to [§ 107] are in line with the rational [sic] of the recent Supreme Court decision in the case of Cabazon Band of Mission Indians versus California. This amendment in effect would codify for [the Tribe] the holding and rational [sic] adopted in the Court's opinion in the case.

133 CONG. REC. H6975 (daily ed. Aug. 3, 1987) (statement of Rep. Udall). Standing alone, this statement supports the Tribe's argument that Congress intended to incorporate Cabazon Band into the Restoration Act. But we find ourselves confronted with substantial legislative history to the contrary, including the plain language of § 107(a), its accompanying report language, and the tribal resolution to which § 107(a) expressly refers. We cannot set aside this wealth of legislative history simply to give meaning to the floor statement of just one representative that was recited at the twelfth hour of the bill's consideration. See, e.g., Fort Stewart Schools v. Federal Labor Relations Auth., 495 U.S. 641, 648-50 (1990). Rather, upon reviewing these materials, we are left with the unmistakable conclusion that Congress -- and the Tribe -- intended for Texas' gaming laws and regulations to operate as surrogate federal law on the Tribe's reservation in Texas.[20]

---

[20]We are aware that the Supreme Court has established some rules of construction as to Acts of Congress relating to Indian affairs which require that Congress' intention be "explicit," "clear," "unambiguous," "plain" and "specific." See United States v. Santa Fe Pac. R.R. Co., 314 U.S. 339 (1941); United States v. Dion, 476 U.S. 734 (1986); Solem v. Bartlett, 465 U.S. 463 (1984). The Restoration Act satisfies these requirements.

21

B.

We find it significant that § 107(c) of the Restoration Act establishes a procedure for enforcement of § 107(a) which is fundamentally at odds with the concepts of IGRA. Under § 107(c), the state of Texas is authorized to file suit in a federal court to enjoin any violation by the Tribe of the provisions of § 107(a). 25 U.S.C. § 1300g-6(c); see also S. REP. No. 90 at 9. The state of Texas did not initiate his litigation under § 107(c); rather, the Tribe brought this suit under IGRA. Because the Restoration Act and IGRA establish such fundamentally different regimes, we now must decide which statute applies in this case. The Tribe argues that, to the extent that a conflict between the two exists, IGRA impliedly repeals the Restoration Act. We disagree. The Supreme Court has indicated that "[r]epeals by implication are not favored." Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 442 (1987). The Court in Crawford Fitting further noted that, "where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." Id. at 445 (quoting Radzanower v. Touche Ross & Co., 426 U.S. 148, 153 (1976)). With regard to gaming, the Restoration Act clearly is a specific statute, whereas IGRA is a general one. The former applies to two specifically named Indian tribes located in one particular state, and the latter applies to all tribes nationwide. Congress, when enacting IGRA less than one year after the Restoration Act, explicitly stated in two separate provisions of IGRA that IGRA should be considered in

22

light of other federal law.[21] Congress never indicated in IGRA that it was expressly repealing the Restoration Act. Congress also did not include in IGRA a blanket repealer clause as to other laws in conflict with IGRA. Finally, we note that in 1993, Congress expressly stated that IGRA is <u>not</u> applicable to one Indian tribe in South Carolina, evidencing in our view a clear intention on Congress' part that IGRA is not to be the one and only statute addressing the subject of gaming on Indian lands.[22] Therefore, we conclude not only that the Restoration Act survives today but also that it -- and not IGRA -- would govern the determination of whether gaming activities proposed by the Ysleta del Sur Pueblo are allowed under Texas law, which functions as surrogate federal law.

The Tribe warns that our conclusion (i.e., that Texas gambling laws and regulations are surrogate federal law) will constitute a substantial threat to its sovereignty in that "[e]very time the State modifies its gambling laws, the impact will be felt on the reservation." However, any threat to tribal sovereignty is of the Tribe's own making. The Tribe noted in its resolution that it viewed § 107(a) of the Restoration Act as "a substantial infringement upon the Tribes' [sic] power of self government" but nonetheless concluded that relinquishment of that power was

---

[21]<u>See</u> 25 U.S.C. § 2701(5) ("[t]he Congress finds that . . . Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by federal law"); <u>id</u>. § 2710(b)(1)(A) (tribes may engage in Class II gaming if, <u>inter alia</u>, "such gaming is not otherwise specifically prohibited on Indian lands by Federal law").

[22]<u>See</u> 25 U.S.C. § 941l(a).

23

necessary to secure passage of the Act. To borrow IGRA terminology, the Tribe has already made its "compact" with the state of Texas, and the Restoration Act embodies that compact. If the Ysleta del Sur Pueblo wishes to vitiate the compact it made to secure passage of the Restoration Act, it will have to petition Congress to amend or repeal the Restoration Act rather than merely comply with the procedures of IGRA.

C.

Finally, having concluded that the Restoration Act governs this case, we now must determine whether the Tribe's suit against the State is cognizable. The Eleventh Amendment bars any suit against a state in federal court, unless either the state has waived its sovereign immunity or Congress, pursuant to another provision in the Constitution, has expressly abrogated the state's immunity. <u>Atascadero State Hosp. v. Scanlon</u>, 473 U.S. 234, 237-40 (1985). A state's sovereign immunity under the Eleventh Amendment includes immunity from suits brought by Indian tribes. <u>Blatchford v. Native Village of Noatak</u>, 111 S. Ct. 2578 (1991). While the State clearly raised the Eleventh Amendment as a defense to the Tribe's IGRA suit, it did not do the same with regard to the Restoration Act. The State's omission, however, does not mean we are precluded from raising the issue <u>sua sponte</u>, because the Eleventh Amendment operates as a jurisdictional bar. <u>See</u> <u>Edelman v. Jordan</u>, 415 U.S. 651, 678 (1974); <u>Ortiz v. Regan</u>, 749 F. Supp. 1254, 1264 (S.D.N.Y. 1990); 13 Charles A. Wright et al., Federal Practice and Procedure § 3524 at 167-71. We find nothing in the record

24

indicating that the state of Texas consented to the Tribe's suit. Likewise, in enacting the Restoration Act, Congress said nothing whatsoever which could be construed as an abrogation of the State's sovereign immunity. Accordingly, we reverse the district court's summary judgment in favor of the Tribe and remand the case with instructions to dismiss the Tribe's suit for lack of jurisdiction.

IV.

For the foregoing reasons, we REVERSE the district court's summary judgment for the Tribe and REMAND with instructions to DISMISS the Tribe's suit.