# FORT STEWART SCHOOLS *v.* FEDERAL LABOR RELATIONS AUTHORITY ET AL.

No. 89–65.  Argued January 10, 1990—Decided May 29, 1990

SCALIA, J., delivered the opinion for a unanimous Court.  MARSHALL, J., filed a concurring opinion, *post*, at p. 657.

*Christopher J. Wright* argued the cause for petitioner. With him on the briefs were *Acting Solicitor General Rob-*

erts, *Assistant Attorney General Gerson, Deputy Solicitor General Shapiro, William Kanter,* and *Jacob. M. Lewis.*

*William E. Persina* argued the cause for respondents. With him on the brief for respondent Federal Labor Relations Authority was *Jill A. Griffin.* *Richard J. Hirn* and *Ronald R. Austin* filed a brief for respondent Fort Stewart Association of Educators.*

JUSTICE SCALIA delivered the opinion of the Court.

In this case we review the decision of the Federal Labor Relations Authority that petitioner Fort Stewart Schools, a Federal Government employer, is required to bargain with the labor union representing its employees over a proposal relating to wages and fringe benefits.

I

Respondent Fort Stewart Association of Educators (Union), is the collective-bargaining representative of the employees of two elementary schools at Fort Stewart, a United States military facility in Georgia. The schools, petitioner here, are owned and operated by the United States Army under authority of 64 Stat. 1107, 20 U. S. C. § 241(a), which directs the Secretary of Health and Human Services to "make such arrangements . . . as may be necessary to provide free public education" for children living on federally owned property. The present controversy arose when, during the course of collective-bargaining negotiations, the Union submitted to the schools proposals relating to mileage reimbursement, various types of paid leave, and a salary increase. Petitioner declined to negotiate these matters, claiming that they were not subject to bargaining under Title VII of the Civil Service Reform Act of 1978, sometimes re-

---

*Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations et al. by *Jeremiah A. Collins, Laurence Gold, Mark D. Roth, Kevin M. Grile,* and *Lawrence A. Poltrock;* and for the National Treasury Employees Union by *Gregory O'Duden* and *Kerry L. Adams.*

ferred to as the Federal Service Labor-Management Relations Statute, 5 U. S. C. § 7101 *et seq.* (FSLMRS or Statute). The Union sought the aid of the Federal Labor Relations Authority pursuant to §§ 7105(a)(2)(D) and (E) and the Authority held that the Union's proposals were negotiable. *Fort Stewart Assn. of Educators,* 28 F. L. R. A. 547 (1987). Upon a petition for review by petitioner and cross-petitions for enforcement by the Authority and the Union, the Court of Appeals for the Eleventh Circuit upheld the Authority's decision, 860 F. 2d 396 (1988), and we granted certiorari, 493 U. S. 807 (1989).

## II

The FSLMRS requires a federal agency to negotiate in good faith with the chosen representative of employees covered by the Statute, 5 U. S. C. § 7114(a)(4), and makes it an unfair labor practice to refuse to do so, § 7116(a)(5). The scope of the negotiating obligation is set forth in § 7102, which confers upon covered employees the right, through their chosen representative, "to engage in collective bargaining with respect to conditions of employment." § 7102(2). Section 7103(a)(14) defines "conditions of employment" as follows:

> "'conditions of employment' means personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions, except that such term does not include policies, practices, and matters —
>
> "(A) relating to political activities prohibited under subchapter III of chapter 73 of this title;
>
> "(B) relating to the classification of any position; or
>
> "(C) to the extent such matters are specifically provided for by Federal statute . . . ."

In construing these provisions, and the other provisions of the FSLMRS at issue in this case, the Authority was interpreting the statute that it is charged with implementing, see

§ 7105. We must therefore review its conclusions under the standard set forth in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). If, upon examination of "the particular statutory language at issue, as well as the language and design of the statute as a whole," *K mart Corp.* v. *Cartier, Inc.*, 486 U. S. 281, 291 (1988), it is clear that the Authority's interpretation is incorrect, then we need look no further, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U. S., at 842–843. If, on the other hand, "the statute is silent or ambiguous" on the point at issue, we must decide "whether the agency's answer is based on a permissible construction of the statute." *Ibid.*

The Authority concluded that the Union's proposals related to "conditions of employment," following its decision in *American Federation of Government Employees, AFL–CIO, Local 1897*, 24 F. L. R. A. 377, 379 (1986) *(AFGE)*. 28 F. L. R. A., at 550–551. Petitioner claims that this was error because § 7103(a)(14) defines "conditions of employment" as matters affecting "working conditions," and because the latter term most naturally connotes "the physical conditions under which an employee labors," Brief for Petitioner 17. The difficulty here, of course, is that the word "conditions" has two common meanings. It can mean matters "established or agreed upon as a requisite to the doing . . . of something else"; and it can also mean "attendant circumstances," or an "existing state of affairs." Webster's Third New International Dictionary 473 (1961). Whereas the term "conditions of employment" in § 7102 seems to us equally susceptible of both meanings, petitioner is correct that the term "working conditions" in the defining provision of § 7103(a)(14) more naturally refers, in isolation, only to the "circumstances" or "state of affairs" attendant to one's performance of a job. See *Department of Defense Dependents Schools* v. *FLRA*, 274 U. S. App. D. C. 299, 301, 863 F. 2d 988, 990 (1988) ("The term 'working conditions' ordinarily calls to

mind the day-to-day circumstances under which an employee performs his or her job"), rehearing en banc granted, No. 87–1733 (Feb. 6, 1989). Even if, however, it could not reasonably be interpreted to bear the other meaning in isolation, here it is not in isolation, but forms part of a paragraph whose structure, as a whole, lends support to the Authority's broader reading.

As set forth above, § 7103(a)(14) specifically excepts from the definition of "conditions of employment" (and thus suggests *are covered* by the term "working conditions") "policies, practices, and matters . . . relating to political activities prohibited under subchapter III of chapter 73 of this title." The subchapter referred to contains restrictions on partisan political activities of federal employees and protects them from being required or coerced to engage in political activity. It is barely conceivable, but most unlikely, that this provision of § 7103(a)(14) was meant to exclude from collective-bargaining proposals that would somehow infect with politics the "physical conditions" of the workplace; it seems much more plausibly directed at "conditions of employment" in the sense of qualifications demanded of, or obligations imposed upon, employees. And the second exception set forth in § 7103(a)(14), as set forth above, *unquestionably* assumes that "conditions of employment" (and hence "working conditions") bears this broader meaning. The exception of "policies, practices, and matters . . . relating to the classification of any position" would be utterly unnecessary if petitioner's interpretation of "working conditions" were correct.

It might reasonably be argued, of course, that these two exceptions are indeed technically unnecessary, and were inserted out of an abundance of caution—a drafting imprecision venerable enough to have left its mark on legal Latin *(ex abundanti cautela)*. But petitioner does not make this argument. Indeed, in its reply brief petitioner claims that it is "a serious distortion of [its] position," Reply Brief for Petitioner 2, to characterize it, as respondent Union does, as asserting

that "negotiations over 'working conditions' are limited to the physical conditions under which an employee labors." Brief for Respondent Union 11. Petitioner asserts that, to the contrary, it "recognize[s] that the phrase 'conditions of employment' is no doubt susceptible of diverse interpretations," including an interpretation whereby it would embrace "any subject which is insisted upon as a prerequisite for continued employment," Reply Brief for Petitioner 2 (internal quotations omitted); and petitioner even acknowledges, with apparent approval, that the phrase in the present statute "has been extended beyond the purely physical conditions of the workplace," *ibid.* The textual argument is thus abandoned. Petitioner seeks to persuade us, not (as respondent Union does) that the term "conditions of employment" (as defined to include only "working conditions") bears one, rather than the other, of its two possible meanings; but rather to persuade us that it bears some third meaning no one has ever conceived of, so that it includes *other* insisted-upon prerequisites for continued employment, but does not include the insisted-upon prerequisite *par excellence*, wages. And this new unheard-of meaning, petitioner contends, is so "unambiguously expressed," *Chevron, supra,* at 843, that we must impose it upon the agency initially responsible for interpreting the statute, despite the deference otherwise accorded under *Chevron.* To describe this position is sufficient to reject it, but we nonetheless examine briefly the elements petitioner sets forth to establish that "conditions of employment" clearly has a meaning here that it bears nowhere else.

Petitioner points to the National Labor Relations Act, 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.,* which authorizes bargaining over "wages, hours, and other terms and conditions of employment," § 158(d), and to the Postal Reorganization Act, 39 U. S. C. § 1201 *et seq.,* which grants postal workers the right to bargain over "wages, hours, and working conditions." Note following § 1201. Because each of these statutes specifically refers to wages, the argument

runs, we must infer from the absence of such a reference in the FSLMRS that Congress did not mean to include them. But those other statutes deal with labor-management relations in entirely different fields of employment, and the FSLMRS contains no indication that it is to be read *in pari materia* with them. The first of those provisions does (perhaps) show that the term "conditions of employment" can be used to refer only to physical circumstances of employment; and the second of them does (perhaps) show that "working conditions" is more naturally used to mean that—but those are points we have already conceded.

Petitioner discusses at great length the legislative history of the Statute, from which it has culled a formidable number of statements suggesting that certain members and committees of Congress did not think the duty to bargain would extend to proposals relating to wages and fringe benefits. A Senate Report, for example, states unequivocally that "[t]he bill permits unions to bargain collectively on personnel policies and practices, and other matters affecting working conditions within the authority of agency managers. . . . It excludes bargaining on economic matters . . . ." S. Rep. No. 95–969, pp. 12–13 (1978). A House Report recounts that the bill "does not permit . . . bargaining on wages and fringe benefits . . . ." H. R. Rep. No. 95–1403, p. 12 (1978). To like effect are numerous floor statements by both sponsors and opponents.[1]

---

[1] See 124 Cong. Rec. 25716, 29182 (1978) (remarks of Rep. Udall) ("We do not permit bargaining over pay and fringe benefits, but on other issues relating to an employee's livelihood") ("There is not really any argument in this bill or in this title about Federal collective bargaining for wages and fringe benefits and retirement"); *id.*, at 24286, 25720 (remarks of Rep. Clay) ("[E]mployees still . . . cannot bargain over pay") ("I . . . want to assure my colleagues that there is nothing in this bill which allows Federal employees the right . . . to negotiate over pay and money-related fringe benefits"); *id.*, at 27549 (remarks of Sen. Sasser) ("[E]xclusive representatives of Federal employees may not bargain over pay or fringe benefits").

The trouble with these statements, to the extent they are relevant to our inquiry, is that they may have been wrong. The wages and fringe benefits of the overwhelming majority of Executive Branch employees are fixed by law, in accordance with the General Schedules of the Civil Service Act, see 5 U. S. C. § 5332, and are therefore eliminated from the definition of "conditions of employment" by the third exception in § 7103(a)(14) set forth above—which excludes "matters . . . specifically provided for by Federal statute." 5 U. S. C. § 7103(a)(14)(C). Employees of schools established under § 241 are among a miniscule minority of federal employees whose wages are exempted from operation of the General Schedules. Title 20 U. S. C. § 241(a) provides that an agency establishing such a school may fix "the compensation, tenure, leave, hours of work, and other incidents of the employment relationship" of its employees "without regard to the Civil Service Act and rules." *Ibid.* See also *AFGE*, 24 F. L. R. A., at 378. The legislative materials to which petitioner refers display no awareness of this exception. To the contrary, numerous statements, many from the same sources to which petitioner points, display the erroneous belief that the wages and fringe benefits of *all* Executive Branch employees were set by statute. See H. R. Rep. No. 95–1403, p. 12 (1978) ("Federal pay will continue to be set in accordance with the pay provisions of title 5, and fringe benefits, including retirement, insurance, and leave, will continue to be set by Congress"); *id.*, at 44 ("Rates of overtime pay are not bargainable, because they are specifically provided for by statute").[2] Thus, all of the statements to which petitioner

[2] Statements from the floor are to like effect. See *id.*, at 25721, 25722 (remarks of Rep. Ford) ("[N]o matters that are governed by statute (such as pay, money-related fringe benefits, retirement, and so forth) could be altered by a negotiated agreement") ("It is not the intent of this provision to interfere with the current system of providing the employees in question with retirement benefits, life insurance benefits, health insurance benefits, and workmen's compensation. Those benefits would not become negotiable and would continue to be paid to those employees exclusively pursuant

refers may have rested upon the following syllogism: The wages and fringe benefits of all federal employees are specifically provided for by federal statute; "conditions of employment" subject to the duty to bargain do not include "matters . . . specifically provided for by Federal statute"; therefore "conditions of employment" subject to the duty to bargain do not include the wages and fringe benefits of all federal employees. Since the premise of that syllogism is wrong, so may be its expressed conclusion. There is no conceivable persuasive effect in legislative history that may reflect nothing more than the speakers' incomplete understanding of the world upon which the statute will operate. Cf. *Yellow Freight System, Inc.* v. *Donnelly*, 494 U. S. 820, 824 (1990) (expectation by Members of Congress that all Title VII suits would be tried in federal court, "even if universally shared," does not establish that the statute requires such suits to be brought in federal court).

### III

Petitioner next argues that, even if the Union's proposals relate to "conditions of employment" subject to bargaining under § 7102, they are exempted from the statutory duty to bargain by § 7106, which provides that "nothing in this chapter shall affect the authority of any management official of any agency . . . to determine the . . . budget . . . of the agency . . . ." 5 U. S. C. § 7106. The Authority rejected that claim by applying the test established in its decision in *American Federation of Government Employees, AFL–CIO*, 2 F. L. R. A. 604 (1980), enf'd on other grounds *sub nom.*

---

to the Federal statutes in effect"); *id.*, at 29182 (remarks of Sen. Udall) ("All these major regulations about wages and hours and retirement and benefits will continue to be established by law through congressional action"); *id.*, at 29174 (remarks of Rep. Collins) (criticizing the bill as too broad because it excluded from the scope of bargaining only "matter[s] relating to discrimination, political activities, and those few specifically prescribed by law—for example, pay and benefits").

*Department of Defense* v. *FLRA*, 212 U. S. App. D. C. 256, 659 F. 2d 1140 (1981), cert. denied, 455 U. S. 945 (1982):

"To establish that a proposal directly interferes with an agency's right to determine its budget under section 7106(a)(1) of the Statute, an agency must make a substantial showing that the proposal requires the inclusion of a particular program or amount in its budget *or that the proposal will result in significant and unavoidable increases in cost not affected* [sic: *offset*] *by compensating benefits.*" 28 F. L. R. A., at 551 (emphasis added).

Because petitioner did not contend that the Union's proposal required "the inclusion of a particular program or amount in its budget," the only question for the Authority was whether petitioner had made out its case under the underscored standard. The Authority held that it had not, finding that petitioner had shown neither that its costs would be significantly and unavoidably increased were it to accept the proposals offered by the Union, nor that "any increased costs . . . would not be offset by compensating benefits." *Id.*, at 552.

The parties initially dispute which entity is the relevant "agency" for purposes of determining whether the Union's proposals would "affect the authority of any management official of any agency . . . to determine the . . . budget . . . of the agency . . . ." 5 U. S. C. § 7106(a). The Authority concluded only that petitioner had not satisfied § 7106(a) with respect to its own budget, *i. e.*, that of the schools at the Fort Stewart Army base. The Court of Appeals upheld the Authority's decision, but did so by reference to the budget of the Army as a whole, which it noted "includes bases, troops, weapons, vehicles, other equipment, salaries for all other officers, and expenses for its eight other schools." 860 F. 2d, at 405–406. We cannot, however, uphold the Authority's decision on that basis, for it is elementary that if an agency's decision is to be sustained in the courts on any rationale under which the agency's factual or legal determinations are

entitled to deference, it must be upheld on the rationale set forth by the agency itself. *SEC* v. *Chenery Corp.*, 318 U. S. 80, 93–95 (1943). Because petitioner does not challenge, as a ground for reversing the Authority's decision, its determination to look only to petitioner's budget, we assume without deciding that that determination was correct.

Petitioner does not take issue with the Authority's premise that § 7106 does not make a proposal nonnegotiable simply because it "imposes a cost upon the agency which requires the expenditure of appropriated agency funds." See 28 F. L. R. A., at 607. Rather, petitioner argues that "the application of the FLRA's rule here—particularly the conclusion that the proposal calling for a 13.5% pay raise would not significantly affect the agency's budget—is plainly flawed." Brief for Petitioner 28. Petitioner also claims that "the other aspect of the FLRA's rule—requiring management to show that a significant increase in costs would not be offset by compensating benefits—is not reasonable or consistent with the statute, because it negates management's right to set the agency budget." *Ibid.*

The latter observation has some force if the Authority's definition of "compensating benefits" is as petitioner describes it. Petitioner claims that, in order to prove that the cost of a given proposal is not outweighed by "compensating benefits," an agency must disprove not only monetary benefits, but also nonmonetary "intangible" benefits such as the positive effects that a proposed change might have on employee morale. Although counsel for the Authority agreed with petitioner's statement of its test at oral argument before this Court, it is not entirely clear from the Authority's cases that the "benefits" side of the calculus is as all embracing as petitioner suggests. Cf. *International Association of Fire Fighters Local F-61*, 3 F. L. R. A. 438, 452 (1980) (rejecting agency's claim of no "compensating benefits" where "the agency has made no substantial demonstration that the increased costs . . . will not be offset by increased employee

performance, reduced turnover, fewer grievances and the like"). Indeed, it is difficult to see how the Authority could possibly derive a test measured by nonmonetary benefits from a provision that speaks only to the agency's "authority . . . to determine . . . [its] budget," a phrase that can only be understood to refer to the allocation of funds within the agency.

We need not dwell on this point, however, because the Authority's first ground for its decision is supported by substantial evidence. Petitioner has challenged neither the Authority's requirement that an agency show a significant and unavoidable increase in its costs, nor the Authority's finding that petitioner failed to submit any evidence on that point in this case. Rather, it asks us to hold that a proposal calling for a 13.5% salary increase would necessarily result in a "significant and unavoidable" increase in the agency's overall costs. We cannot do that without knowing even so rudimentary a fact as the percentage of the agency's budget attributable to teachers' salaries. Under the Authority's precedents, petitioner had the burden of proof on this point, but it placed nothing in the record to document its total costs or even its current total teachers' salaries. The Authority reasonably determined that it could not conclude from an increase in one budget item of indeterminate amount whether petitioner's costs as a whole would be "significant[ly] and unavoidabl[y]" increased.[3]

## IV

Petitioner's final argument rests upon 20 U. S. C. § 241, which directs the agency establishing a school thereunder to "ensure that the education provided pursuant to such arrangement is comparable to free public education provided

---

[3] Because petitioner loses under the standard set out in the second part of the Authority's test, and because neither party challenges that standard, we need not reach the question discussed in JUSTICE MARSHALL's opinion, viz., whether the Authority's interpretation of the phrase "to determine the . . . budget" in § 7106 is too generous to the Government.

for children in comparable communities in the State," § 241 (a), and to limit expenditures "[t]o the maximum extent practicable" to "an amount per pupil which will not exceed the per pupil cost of free public education provided for children in comparable communities in the State," § 241(e). In implementing this provision, the Army has promulgated a regulation stating that education provided under § 241 "will be considered comparable to free public education offered by selected communities of the State" when 10 specified factors, including "[s]alary schedules" are, "to the maximum extent practicable, equal." Army Reg. 352–3, 1–7(h) (1980). Petitioner claims—and we assume for purposes of this discussion—that in order to accept the Union's proposals, it would have to contravene this regulation because the proposed salaries would exceed those of employees of the local school systems.

It is a familiar rule of administrative law that an agency must abide by its own regulations. *Vitarelli* v. *Seaton*, 359 U. S. 535, 547 (1959); *Service* v. *Dulles*, 354 U. S. 363, 388 (1957). That says nothing, however, about whether an agency can be compelled to negotiate about a change in its regulations. The latter question is addressed by 5 U. S. C. § 7117(a)(2), which provides, insofar as applicable to the regulation here, that "[t]he duty to bargain in good faith shall, to the extent not inconsistent with Federal law or any Government-wide rule or regulation, extend to matters which are the subject of any agency rule or regulation . . . *only if the Authority has determined under subsection (b) of this section that no compelling need (as determined under regulations prescribed by the Authority) exists for the rule or regulation.*" (Emphasis added.) Section 7117(b) sets out the procedures by which the Authority is to make its "compelling need" determination, see generally *FLRA* v. *Aberdeen Proving Ground, Department of Army*, 485 U. S. 409 (1988), and § 7105(a)(2)(D) instructs the Authority to "prescribe criteria" for that determination.

Pursuant to this last provision, the Authority has adopted the following regulation:

> "A compelling need exists for an agency rule or regulation concerning any condition of employment when the agency demonstrates that the rule or regulation meets any one or more of the following illustrative criteria:

> "(a) The rule or regulation is essential, as distinguished from helpful or desirable, to the accomplishment of the mission or the execution of functions of the agency . . . in a manner which is consistent with the requirements of an effective and efficient government.

> "(b) The rule or regulation is necessary to insure the maintenance of basic merit principles.

> "(c) The rule or regulation implements a mandate to the agency . . . under law or other outside authority, which implementation is essentially nondiscretionary in nature." 5 CFR § 2424.11 (1989).

Before the Authority, petitioner rested its entire case upon the assertion that the last of these criteria was satisfied by the provision of Army Regulation 352–3 which requires salaries equal to those of local schools, since that provision "implements the mandate" of § 241(a). The Authority disagreed, following its decision in *Fort Knox Teachers Assn.*, 27 F. L. R. A. 203, 215, 216 (1987), which said that no "compelling need" for Army Regulation 352–3 exists because § 241 does not require the agency "to match exactly the conditions of employment of teachers in local school districts" or "to restrict the Agency's discretion as to the particular employment practices which could be adopted."

Petitioner argues that, although "[s]ection 241 does not specifically provide that teachers' salaries . . . must be set by comparison with those at local public schools," Brief for Petitioner 32, it does state that "[f]or the purpose of providing such comparable education," teachers' salaries and benefits "may be fixed without regard to the [General Schedules set out in the] Civil Service Act," 20 U. S. C. § 241(a). Accord-

ing to petitioner, "it is a fair reading of [§ 241] to conclude that Congress excepted [wages and fringe benefits] from the civil service laws so that they would be set by comparison with those at public schools." Brief for Petitioner 33. That is not so. All that can reasonably be deduced from the exclusion of the General Schedules is that Congress expected teachers' wages and benefits to be one of the elements that the federal agency could adjust in order to render per pupil expenditure comparable to that in local public schools. But to be able to adjust is not to be required to make equal. The statute requires equivalence ("[t]o the maximum extent practicable") in total per pupil expenditure, not in each separate element of educational cost. An agency may well decide to pay teachers more or less than teachers in local schools, in order that it may expend less or more than local schools for other needs of the educational program. It is thus impossible to say that the requirement of Army Reg. 352–3 that teachers' salaries be "to the maximum extent practicable, equal" was "essentially nondiscretionary in nature" within the meaning of § 2424.11(c).

Petitioner insists, however, that reading § 2424.11 this strictly renders that regulation in violation of the Statute, which never requires bargaining over any matter covered by a regulation except "to the extent not inconsistent with Federal law." See § 7117(a)(2); see also § 7117(a)(1). Thus, to recognize a compelling need for a regulation "only if it implements a statutory mandate that leaves an agency absolutely no room for discretion," Brief for Petitioner 33, n. 23, is to render the "compelling need" exception of § 7117(a)(2) a nullity, for bargaining over such a regulation would be "inconsistent with Federal law" anyway. We may assume, without deciding, that petitioner is correct that any rule that meets the § 2424.11(c) "essentially nondiscretionary" standard as interpreted by the Authority would necessarily be a rule required by law. There is some support for that equivalency in the Authority's cases. See, e. g., Fort Knox

*Teachers Assn.*, 25 F. L. R. A. 1119 (1987). But see *National Border Patrol Council, American Federation of Government Employees, AFL–CIO*, 23 F. L. R. A. 106 (1986); *National Federation of Federal Employees, Local 1153*, 26 F. L. R. A. 505 (1987). Even so, the Authority's regulation does not eliminate the "compelling need" exception. Petitioner's argument ignores the existence of subsections (a) and (b) of § 2424.11, which provide alternative methods of proving "compelling need." In this case, to be sure, petitioner chose not to assert a claim that Army Regulation 352–3 was either "essential . . . to the accomplishment of the mission or the execution of functions of the agency," 5 CFR § 2424.11(a) (1989), or "necessary to insure the maintenance of basic merit principles," § 2424.11(b). But, those alternatives were available and suffice to give the regulation for which there is a "compelling need" an existence quite independent of the regulation whose elimination would be inconsistent with law.

For the foregoing reasons, the judgment of the Court of Appeals for the Eleventh Circuit is

*Affirmed.*

JUSTICE MARSHALL, concurring.

I write separately to emphasize that management's prerogative to "determine . . . the . . . budget . . . of the agency," 5 U. S. C. § 7106(a)(1), is reasonably, and perhaps necessarily, subject to a narrower reading than the one adopted by the Federal Labor Relations Authority. The Authority presently interprets that prerogative as exempting from the duty to bargain proposals that either (1) require the inclusion of a particular program or operation in the agency's budget or prescribe the amount to be allocated to them in the budget, or (2) result in significant and unavoidable increases in costs not offset by compensating benefits. *American Federation of Govt. Employees, AFL–CIO (AFGE)*, 2 F. L. R. A. 604, 608 (1980), enf'd on other grounds *sub nom. Department of Defense* v. *FLRA*, 212 U. S. App. D. C. 256, 659 F. 2d 1140 (1981). Section 7106(a)(1) is more naturally read, however,

as withdrawing from mandatory bargaining only those proposals addressed to the budget *per se*, not those that would result in significantly increased expenditures by the agency.

As the Authority stated in formulating its test, "'budget' means a statement of the financial position of a body for a definite period of time based on detailed estimates of planned or expected expenditures during the period and proposals for financing them." *AFGE, supra,* at 608 (citing Webster's Third New International Dictionary (1966)). To "determine the budget," then, means to calculate in advance the funds available to the agency and the allocation of those funds among the agency's programs and operations. See *AFGE, supra,* at 608. The language of the statute thus exempts from the duty to bargain only those proposals that would involve the union in the budget process itself. This interpretation also accords more closely with Congress' intent that the management prerogatives in § 7106 be construed narrowly. See, *e. g.*, 124 Cong. Rec. 29183 (1978) (statement by Rep. Udall, author of the language in § 7106) (§ 7106 is "to be treated narrowly as an exception to the general obligation to bargain over conditions of employment"); *id.*, at 29187 (statement of Rep. Clay) ("[I]t is essential that only those proposals that directly and integrally go to the specified management rights be barred from the negotiations"); H. R. Rep. No. 95–1403, p. 44 (1978) ("The committee intends that section 7106 . . . be read to favor collective bargaining whenever there is doubt as to the negotiability of a subject or a proposal").

The first part of the Authority's test accords with the plain meaning of the budget provision. The second part, however, is at best a stretch of the statutory language. Proposals that impose "significant" and "unavoidable" costs on the agency do not interfere with the agency's prerogative to determine which programs and operations to include in its budget and how to allocate funds among them. Such proposals may of course affect budgetary decisions, but to remove

them from bargaining would eliminate bargaining over many important matters altogether, without any indication that Congress intended to do so.

The Union's proposals in this case would clearly not fall within the agency's budget prerogative because they do not require union involvement in the budget process. Because the Union's proposals are negotiable even under the agency's "significant cost" test, we need not decide whether that test is inconsistent with the statute. The Court's opinion, however, does not foreclose a future challenge to that test.