**NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, et al., Petitioners,**

**v.**

**SECURITIES & EXCHANGE COMMISSION, Respondent,**

**The Southern Company, et al., Intervenors.**

**No. 93–1778.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 11, 1995.

Decided Aug. 22, 1995.

Scott Hempling, Silver Spring, MD, with whom Charles D. Gray, Washington, DC, was on the briefs, argued the cause for petitioners.

Eric Summergrad, Principal Assistant General Counsel, S.E.C., with whom Simon M. Lorne, General Counsel, and Paul Gonson, Sol., S.E.C., Washington, DC, were on the brief, argued the cause for respondent. Judith R. Starr, Counsel, SEC, Washington, DC, entered an appearance, for respondent.

James E. Joiner and William B. Conway, Jr., Atlanta, GA, were on the brief, for intervenor The Southern Co. John R. Molm, Atlanta, GA, entered an appearance.

Sherry A. Quirk, Clinton A. Vince, Washington, DC and Michael W. Tifft, New Orleans, LA, entered appearances for intervenor City of New Orleans. George M. Fleming and William B. McKinley, Jackson, MS, entered appearances for intervenor Mississippi Public Service Com'n. Mary W. Cochran, Little Rock, AR, entered an appearance for intervenor Arkansas Public Service Com'n.

Before EDWARDS, Chief Judge, and WALD and BUCKLEY, Circuit Judges.

BUCKLEY, Circuit Judge:

In 1992, Congress amended the Public Utility Holding Company Act to encourage competition in the market for electric power. The Securities & Exchange Commission promulgated regulations implementing the amendments. The National Association of Regulatory Utility Commissioners now petitions for review, challenging the regulations on the ground that they are inconsistent with the amendments. We deny the petition.

## I. BACKGROUND

In an effort to simplify the public utility holding company system, Congress enacted the Public Utility Holding Company Act of 1935 ("Act"), 15 U.S.C. § 79 (1994), which compelled utility holding companies to "integrate and coordinate their systems and to divest themselves of security holdings of geographically and economically unrelated properties." *North Am. Co. v. SEC*, 327 U.S. 686, 704, 66 S.Ct. 785, 796, 90 L.Ed. 945 (1946). To achieve this integration, the Act requires all holding companies that own securities in a public utility to register with the SEC, 15 U.S.C. § 79d(a)(6); *see also id.* § 79b(a)(7)(A) (defining "holding company"), and to obtain SEC approval before issuing or selling any of its securities. *Id.* §§ 79f(a), 79g(b). Furthermore, the Commission may refuse to authorize the issuance of a security if, among other things,

(1) the security is not reasonably adapted to the security structure of the declarant and other companies in the same holding-company system;

(2) the security is not reasonably adapted to the earning power of the declarant;

\* \* \*

(5) in the case of a security that is a guarantee of, or assumption of liability on, a security of another company, the circumstances are such as to constitute the making of such guaranty or the assumption of such liability an improper risk for the declarant....

*Id.* § 79g(d)(1), (2) & (5).

In 1992, Congress adopted the Energy Policy Act, Pub.L. No. 102–486, 106 Stat. 2776, 2905–10 (1992). Its purpose was to encourage "stead[y] increases [in] U.S. energy security in cost-effective ... ways" by "us[ing] the market rather than government regulation wherever possible both to advance energy security goals and to protect consumers." H.R.Rep. No. 474(I), 102d Cong., 2d Sess. 132, 133 (1992) ("House Report"), *reprinted in* 1992 U.S.C.C.A.N. 1953, 1955, 1956. In order to facilitate the development of a competitive market for wholesale electric power, Congress amended the Act to make it easier for holding companies to invest in an "exempt wholesale generator" or "EWG," which is defined as

any person ... exclusively in the business of owning or operating ... all or part of one or more eligible facilities and selling electric energy at wholesale.

15 U.S.C. § 79z–5a(a)(1). An "eligible facility" is in turn defined to mean a facility that is either "used for the generation of electric energy exclusively for sale at wholesale, or ... used for the generation of electric energy and leased to one or more public utility companies...." *Id.* § 79z–5a(a)(2).

Because Congress viewed the Act's limitations on corporate structures as "stifling [to] the growth of independent power," House Report, 102d Cong., 2d Sess. 139, *reprinted in* 1992 U.S.C.C.A.N. 1962, the 1992 amendments exempted EWGs "from all provisions of [the Act.]" 15 U.S.C. § 79z–5a(e). The amendments also ease the restrictions on companies that wish to invest in EWGs. Registered holding companies are

permitted (without the need to apply for, or receive, approval from the Commission, and otherwise without condition under this [Act] ) to acquire and hold the securities, or an interest in the business, of one or more [EWGs].

*Id.* § 79z–5a(g). Although the Commission must still approve the issuance or sale of securities by a registered holding company, section 32(h)(3) of the amended Act provides that if the securities are to be issued for the purpose of financing the acquisition of an EWG,

the Commission shall not make a finding that such security is not reasonably adapted to the earning power of such company or to the security structure of such company ... *unless the Commission first finds that the issue or sale* of such security, or the making of the guarantee, *would have a substantial adverse impact on the financial integrity of the registered holding company system....*

*Id.* § 79z–5a(h)(3) (emphasis added).

Thus, under section 32(h)(3), the Commission does not make the findings required by section 7(d) of the Act, *see id.* § 79g(d)(1), (2) & (5), unless it first determines that the financing at issue would have a "substantial adverse impact" on a registered holding company system's financial integrity. The amendments, however, shed no light on what would constitute such an impact. Instead, section 32(h)(6) delegates that task to the SEC:

[T]he Commission shall promulgate regulations with respect to the actions which would be considered, for purposes of this subsection, to have a substantial adverse impact on the financial integrity of the registered holding company system....

*Id.* § 79z–5a(h)(6). The section stipulates, however, that

such regulations *shall ensure that the action has no adverse impact* on any utility subsidiary or its customers, or on the ability of State commissions to protect such subsidiary or customers....

*Id.* (emphasis added).

In September 1993, the Commission promulgated its final rule describing the circumstances under which it would determine that a proposed issuance or sale of securities would not have a "substantial adverse impact" of the kind described in section 32(h)(3). 17 C.F.R. § 250.53 (1994). In es-

sence, the regulation creates a "safe harbor": if the proposed transaction meets four criteria,

> the Commission shall not make a finding that such security is not reasonably adapted to the earning power of such company or to the security structure of such company or companies in the same holding company system, or that the circumstances are such as to constitute the making of a guarantee an improper risk for such company . . . .

*Id.* § 250.53(a).

The four criteria are (i) that the investment not exceed a certain level of a holding company's retained earnings; (ii) that the holding company provide the Commission access to certain records to identify the investments in, and earnings generated from, any EWG in which the company holds an interest; (iii) that no more than a certain percentage of a holding company's employees render services to the EWG; and (iv) that the holding company provide various documents to the Commission and other affected utility regulators. *See id.* Moreover, under the regulation, the safe harbor is unavailable to any holding company that has experienced recent financial difficulties. *See id.* § 250.53(b). If the safe harbor criteria are not satisfied, the SEC will approve the sale only if the holding company proves that the transaction

> (1) [w]ill not have a substantial adverse impact upon the financial integrity of the registered holding company system; and
>
> (2) [w]ill not have an adverse impact on any utility subsidiary of the registered holding company, or its customers, or on the ability of State commissions to protect such subsidiary or customers.

*Id.* § 250.53(c).

The National Association of Regulatory Utility Commissioners ("NARUC") filed this petition for review alleging that the SEC's regulations were inconsistent with section 32(h)(6).

## II. DISCUSSION

■ This dispute centers on a difference of opinion as to the proper interpretation of section 32(h)(6), which is codified as 15 U.S.C. § 79z–5a(h)(6). Under the familiar *Chevron* standard of review of an agency's interpretation of a statute entrusted to its administration,

> [i]f the intent of Congress is clear . . . the court . . . must give effect to the unambiguously expressed intent of Congress. If, however, . . . the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A. Inc. v. NRDC, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted).

■ In NARUC's view, the Commission disregarded the plain language of the statute by applying section 32(h)(6)'s "no adverse impact" test to only those transactions that fall outside the Commission's safe harbor. NARUC argues that the 1992 amendments required the promulgation of regulations that ensured that a finding of no "substantial adverse impact on the financial integrity of the registered holding company system" would be available only if, under section 32(h)(6), the action had "no adverse impact" on utility subsidiaries, customers, or the ability of state regulators to protect subsidiaries or customers.

The Commission argues that the statute is ambiguous. In its view, section 32(h) reflects an inherent tension between the goal of facilitating greater participation by public utility holding companies in independent wholesale power production and the goal of protecting them and their consumers from the risks associated with these new ventures. In an attempt to accommodate the competing policies of the statute, the Commission interpreted section 32(h)(6) to apply the "no adverse impact" standard to only those actions that "would be considered, for purposes of [section 32(h)], to have a substantial adverse impact on the financial integrity of the registered holding company system. . . ." 15 U.S.C. § 79z–5a(h)(6). According to the Commission, this approach implements the

"substantial adverse impact" standard while also applying the "no adverse impact" clause in appropriate circumstances.

While the Commission concedes that NARUC's interpretation is grammatically possible, it contends that such an approach would frustrate the main purpose of the Act, which was to relax the regulation of EWG financing. According to the Commission, NARUC's position would increase the burden on such financings and would undermine the SEC's attempt to reconcile the competing policies of the statute by requiring disapproval if there is *any* adverse impact on utility subsidiaries, ratepayers, or state regulators.

In our view, the Commission's interpretation is a permissible construction of an ambiguous statute. On the one hand, section 32(h)(3) prohibits the Commission from making certain findings unless it first concludes that the sale of the security would have a "substantial adverse impact" on the financial integrity of the registered holding company system. *Id.* § 79z–5a(h)(3). On the other, section 32(h)(6) requires the Commission to implement regulations that ensure that "the action has no adverse impact" on any utility subsidiaries, customers, or state regulators. *Id.* § 79z–5a(h)(6). The crucial question, then, is whether, as NARUC contends, Congress intended the "no adverse impact" clause of section 32(h)(6) to be the means by which the Commission determines if a sale has a "substantial adverse impact" under section 32(h)(3), or whether, as the Commission contends, only those actions that might have a "substantial adverse impact" should be subject to "no adverse impact" scrutiny. We cannot say that Congress unambiguously intended either.

Each approach has its limits. It would seem a strained interpretation to conclude that *any* adverse impact on a utility customer would constitute a *substantial* adverse impact on the financial integrity of the registered holding company system. On the other hand, it would appear superfluous to ask, after determining that a sale has a *substantial* adverse impact on the financial integrity of the registered holding company system, whether that sale has *any* adverse impact on

utility subsidiaries, customers, or state regulators.

In applying *Chevron,* we examine "the particular statutory language at issue, as well as the language and design of the statute as a whole...." *Fort Stewart Schools v. FLRA,* 495 U.S. 641, 645, 110 S.Ct. 2043, 2046, 109 L.Ed.2d 659 (1990) (internal quotation marks and citation omitted). The purpose of section 32(h)(3) was to incorporate a threshold test that must be triggered before the SEC would scrutinize a proposed issuance or sale of a security under section 7(d) of the Act. *See* 15 U.S.C. § 79z–5a(h)(3). The Commission's regulation is faithful to that design. So long as the action meets four safe harbor criteria, the Commission's inquiry is at an end and the action will be permitted. 17 C.F.R. § 250.53(a). If, however, the action *might* have a substantial adverse impact on the financial integrity of the system, the Commission would apply the heightened scrutiny under both the "substantial adverse impact" test and the "no adverse impact" test. *See id.* § 250.53(c). In this way, the statutory concerns expressed in sections 32(h)(3) and (6) are both given meaning. NARUC's interpretation, by contrast, could create an almost insurmountable obstacle to financings under section 32(h)(3).

Because the Commission's approach represents a rational attempt to balance competing statutory policies, we find its construction permissible. *See National Ass'n of Regulatory Utility Comm'rs v. ICC,* 41 F.3d 721, 728 (D.C.Cir.1994) ("[W]hen legislation delegates to an agency the task of balancing conflicting policy objectives ... an agency is entitled to a wide berth as to the accommodation it reaches."); *see also Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783 (if agency's choice "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears ... that the accommodation is not one that Congress would have sanctioned." (internal citation omitted)) (quoting *United States v. Shimer,* 367 U.S. 374, 382–83, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

NARUC presents two additional challenges to the Commission's regulation, nei-

ther of them persuasive. First, it argues that although section 32(h)(6) requires the Commission to define those actions that "would be considered ... to have a substantial adverse impact" on system integrity, 15 U.S.C. § 79z–5a(h)(6), the regulations do the opposite by defining those actions which would *not* have a substantial adverse impact. 17 C.F.R. § 250.53(c)(1). As the SEC correctly notes, the safe harbor could readily have been stated either negatively or affirmatively.

> By providing a safe harbor for transactions that would not be considered to have a substantial adverse impact upon the financial integrity of a registered holding company system, the Commission has at the same time defined by exclusion a universe of transactions that could be considered to have a substantial adverse impact ... in accordance with the directives of section 32(h)(6).

58 Fed.Reg. 51,488, 51,491 (1993). The SEC has fulfilled its statutory mandate by requiring an applicant unable to satisfy the four criteria in section 250.53(a) to affirmatively demonstrate that the sale will not have a "substantial adverse impact." 17 C.F.R. § 250.53(c)(1).

■ Next, NARUC argues that the Commission failed to explain its rationale in adopting one of the four safe harbor criterion. Under the regulation, an action falls within the safe harbor if, *inter alia*, the "aggregate investment does not exceed 50% of the system's consolidated retained earnings." *Id.* § 250.53(a)(1). NARUC contends that the Commission failed to explain why it chose 50 percent of retained earnings as its criterion.

Congress left the content of the "substantial adverse impact" inquiry to the Commission's discretion, specifying only four factors the regulations had to take into account. One of those was "the amount and type of capital invested in [EWGs]." 15 U.S.C. § 79z–5a(h)(6). The retained earnings factor in the regulation is responsive to that instruction. As for the choice of 50 percent of retained earnings, the Commission's judgment was that a retained earnings cushion that equalled half the amount of financing provided adequate protection. As it explained,

> [t]he selection of a retained earnings standard represents the exercise of the Commission's best judgment based upon its nearly sixty years' experience in the administration of the Act. We believe that this standard, in combination with various other provisions of the rule, should contribute to the protection of the financial integrity of the system and so help to shield the domestic utilities and their customers from the adverse effects, if any, of the new ventures.

58 Fed.Reg. at 51,494. We find the Commission's reliance on its own experience to be entirely reasonable.

### III. CONCLUSION

For the foregoing reasons, NARUC's petition for review is

*Denied.*