# United States Court of Appeals for the Federal Circuit

2008-1409

UNITED STATES,

Plaintiff-Appellee,

v.

UPS CUSTOMHOUSE BROKERAGE, INC.,

Defendant-Appellant.

Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for plaintiff-appellee. With her on the brief was Jeanne E. Davidson, Director. Of counsel on the brief were Courtney E. Sheehan, Attorney, and Edward M. Greenwald, Attorney, Office of the Associate Chief Counsel, United States Customs & Border Protection, United States Department of Homeland Security, of Chicago, Illinois.

Terence J. Lynam, Akin Gump Strauss Hauer & Feld LLP, of Washington, DC, argued for defendant-appellant. With him on the brief were Lars-Erik A. Hjelm, Tamer A. Soliman and Monica P. Sekhon.

Joseph M. Spraragen, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, New York, for amicus curiae. With him on the brief were Alan R. Klestadt and Robert B. Silverman.

Appealed from: United States Court of International Trade

Judge Gregory W. Carman

# United States Court of Appeals for the Federal Circuit

2008-1409

UNITED STATES,

Plaintiff-Appellee,

v.

UPS CUSTOMHOUSE BROKERAGE, INC.,

Defendant-Appellant.

Appeal from the United States Court of International Trade in case No. 04-00650, Judge Gregory W. Carman.

_____

DECIDED: August 11, 2009

_____

Before SCHALL, ARCHER, and MOORE, Circuit Judges.

ARCHER, Circuit Judge.

UPS Customhouse Brokerage, Inc. ("UPS") appeals the Court of International Trade's judgment in favor of the United States. The Court of International Trade held 1) UPS misclassified certain merchandise under subheading 8473.30.9000 of the Harmonized Tariff Schedule of the United States ("HTSUS"); 2) UPS's misclassification established multiple violations of 19 U.S.C. § 1641, which requires brokers to exercise responsible supervision and control over their customs business; and 3) the United States is entitled to a judgment in the amount of $75,000 against UPS. United States v. UPS Customhouse Brokerage, Inc., 558 F. Supp. 2d 1331 (Ct. Int'l Trade May 28, 2008). We affirm the court's holding that UPS misclassified merchandise under subheading 8473.30.9000. Because the Court of International Trade erred in upholding

the Bureau of Customs and Border Protection's ("Customs") determination that UPS did not exercise responsible supervision and control in violation of 19 U.S.C. § 1641, we vacate that portion of the court's judgment and remand for further proceedings.

I

Since 1985, UPS has been a licensed customs broker that prepares and files customs entry documents on behalf of its clients. This case arises from UPS's classification entries under HTSUS heading 8473, which covers parts and accessories of automated data processing ("ADP") machines. From January through May 2000, UPS classified the sixty entries at issue here under HTSUS subheading 8473.30.9000. Customs claimed that the entries were misclassified because HTSUS 8473.30.9000 required the parts at issue to contain a cathode ray tube ("CRT"), rather than being part of a computer that contained a CRT.

Customs initiated eight penalty actions against UPS covering the sixty alleged misclassified entries as follows: three pre-penalty notices for $5,000 each on May 15, 2000, with each notice consisting of five entries; three pre-penalty notices for $5,000 each on July 11, 2000, with each notice consisting of five entries; and two pre-penalty notices for $30,000 each on August 15, 2000, with each notice consisting of fifteen entries. All eight of the pre-penalty notices alleged a failure to exercise responsible supervision and control in classifying ADP parts under HTSUS subheading 8473.30.9000. On September 15, 2000, Customs issued three penalty notices for $5,000 each based on the May 15 pre-penalty notices. UPS paid these penalties. On September 26, 2000, Customs issued three more penalty notices for $5,000 each based on the July 11 pre-penalty notices, and on October 19, 2000, Customs issued

two more penalty notices for $30,000 each based on the August 15 pre-penalty notices. The penalties assessed totaled $90,000.

On December 17, 2004, the government brought suit in the Court of International Trade seeking to enforce the unpaid portion of the penalties—i.e., $75,000. UPS moved for summary judgment on the issue of whether 19 U.S.C. § 1641 limited Customs to assessing a single penalty for all alleged violations preceding issuance of the first pre-penalty notice or, alternatively, whether it limited Customs to an aggregate monetary penalty of $30,000 for all alleged violations preceding issuance of the first pre-penalty notice.[1] The court denied the motion.[2]

Following trial, the Court of International Trade held that the computer parts were misclassified and that the repeated misclassifications constituted multiple violations of the statutory duty to exercise responsible supervision and control. The court then concluded that Customs had demonstrated that UPS failed to exercise responsible supervision and control and that Customs established that UPS violated 19 U.S.C. § 1641 on multiple occasions. The Court of International Trade further held

---

[1] These issues were briefed by the parties in this appeal, but we decline to consider them now because of our decision that the Court of International Trade erred in upholding the underlying determination by Customs that UPS did not exercise responsible supervision and control as required by 19 U.S.C. § 1641.

[2] The Court of International Trade granted UPS's motion to certify for interlocutory appeal the question of whether under 19 U.S.C. § 1641 Customs:

> may issue more than one penalty notice for a customs broker's alleged failure to exercise responsible supervision and control based upon the customs broker's alleged repeated misclassification of entered merchandise over a period of time and on multiple separate entry documents; and if so, whether the aggregate penalty sought from those multiple penalty notices may exceed $30,000.

This court, however, denied the petition for permission to appeal.

that the United States was entitled to a judgment in the amount of $75,000, plus any applicable interest that may be due.

UPS appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

II

"The ultimate question in a classification case is whether the merchandise is properly classified under one or another classification heading. We have consistently viewed this as a question of law, see Sports Graphics, Inc. v. United States, 24 F.3d 1390, 1391 (Fed. Cir. 1994), because what is at issue is the meaning of the terms set out in the statute . . . ." Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998). Additionally, "[c]onstruction of a statute or regulation is a question of law we review de novo." Summers v. Gober, 225 F.3d 1293, 1295 (Fed. Cir. 2000).

"Despite our de novo review of interpretations of tariff provisions, classification decisions by Customs interpreting provisions of the HTSUS may receive some deference under the principles of Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944)." MetChem, Inc. v. United States, 513 F.3d 1342, 1345 (Fed. Cir. 2008) (citation omitted). Nevertheless, "Customs' rulings are 'not controlling upon the courts by reason of their authority,' Skidmore, 323 U.S. at 140, 65 S. Ct. 161, and 'this court has an independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms.'" Id. (quoting Warner-Lambert Co. v. United States, 407 F.3d 1207, 1209 (Fed. Cir. 2005)).

A

The first issue here is whether UPS properly classified merchandise under HTSUS subheading 8473.30.9000.

A classification decision has two underlying steps: "first, construe the relevant classification headings; and second, determine under which of the properly construed tariff terms the merchandise at issue falls." Bausch & Lomb, Inc., 148 F.3d at 1364-65.

"The HTSUS scheme is organized by headings, each of which has one or more subheadings; the headings set forth general categories of merchandise, and the subheadings provide a more particularized segregation of the goods within each category." Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998). "The proper classification of merchandise entering the United States is directed by the General Rules of Interpretation ('GRIs') of the HTSUS and the Additional United States Rules of Interpretation." Id. GRI 1 states that "classification shall be determined according to the terms of the headings and any relative section or chapter notes." GRI 1, HTSUS (2000). Accordingly, "[a] classification analysis begins . . . with the language of the headings." Orlando Food Corp., 140 F.3d at 1440.

UPS asserts that the subheadings of 8473.30 are properly read as dividing items based on whether the machine of which they are a part contains a CRT. Thus, the parts and accessories imported under subheadings 8473.30.6000 and 8473.30.9000 need not themselves contain CRTs, but merely the assembled machines must contain CRTs. The government argues that such a position does not make sense since subheadings under 8471 are divided according to whether the machines contain CRTs

(among other things),[3] and subheadings under 8473 are divided according to whether the parts or accessories (of the machines of heading 8471) contain CRTs.

Heading 8471 is entitled "[a]utomatic data processing machines . . . ; magnetic or optical readers, machines for transcribing data onto data media in coded form and machines for processing such data."  HTSUS 8471 (2000).  Heading 8473 is entitled "[p]arts and accessories (other than covers, carrying cases and the like) suitable for use solely or principally with machines of headings 8469 to 8472."  HTSUS 8473 (2000).

---

[3]       The beginning of heading 8471 is as follows:

| 8471 | Automatic data processing machines and units thereof; magnetic or optical readers, machines for transcribing data onto data media in coded form and machines for processing such data, not elsewhere specified or included: |
|---|---|
| 8471.10.0000 | Analog or hybrid automatic data processing machines |
| 8471.30.0000 | Portable digital automatic data processing machines, weighing not more than 10 kg, consisting of at least a central processing unit, a key board and a display |
| | Other digital automatic data processing machines: |
| 8471.41.00 | Comprising in the same housing at least a central processing unit and an input and output unit, whether or not combined |
| | With cathode-ray tube (CRT) |
| 8471.41.0035 | Color |
| 8471.41.0065 | Other |
| 8471.41.0095 | Other |
| 8471.49 | Other, entered in the form of systems: |
| 8471.49.10 | Digital processing units entered with the rest of a system, whether or not containing in the same housing one or two of the following types of unit: storage units, input units, output units |
| | With cathode-ray tube (CRT): |
| 8471.49.1035 | Color |
| 8471.49.1065 | Other |
| 8471.49.1095 | Other . . . . |

Subheading 8473.30 is entitled "[p]arts and accessories of the machines of heading 8471." HTSUS 8473.30 (2000). Subheading 8473.30 breaks out further into additional differentiated subcategories:

8473.30   Parts and accessories of the machines of heading 8471:
              Not incorporating a cathode ray tube:
8473.30.1000              Printed circuit assemblies
8473.30.2000              Parts and accessories, including face plates and lock latches, or printed circuit assemblies

8473.30.3000              Other parts for printers, specified in additional U.S. note 2 to this chapter

8473.30.5000              Other

          Other
8473.30.6000              Other parts for printers, specified in additional U.S. note 2 to this chapter

8473.30.9000              Other

Subheading 8473.30 is specifically reserved for "[p]arts and accessories of the machines of heading 8471." HTSUS 8473.30 (2000). Thus, subheading 8473.30 is a parts provision. The subheading does not include the machines themselves, as posited by UPS. The machines themselves would fall under heading 8471. This, by itself, undermines UPS's argument.

UPS argues that the last antecedent rule supports its interpretation. This is incorrect. Under the last antecedent rule, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediate follows." Barnhart v. Thomas, 540 U.S. 20, 26 (2003). Applying this rule in the manner UPS suggests strains logic and grammar. The main clause of subheading 8473.30 provides "[p]arts and accessories of the machines of heading 8471." Immediately following this

phrase, on the next line, and indented, is the text "[n]ot incorporating a cathode ray tube."  This phrase does not, as UPS asserts, modify the phrase "the machines of heading 8471."  The indentation of the phrase demonstrates that "[n]ot incorporating a cathode ray tube" is a subset of the higher-level subheading of "[p]arts and accessories . . . ."  It is not a continuation of the phrase "machines of heading 8471."  Rather, the prepositional phrase "of the machines of heading 8471" modifies "[p]arts and accessories."

The paragraph structure of subheading 8473.30 demonstrates that there are two types of "parts and accessories":  those "not incorporating a cathode ray tube" and "other."  The articles described in subheadings 8473.30.1000 through 8473.30.5000 cannot contain CRTs, as CRTs are explicitly excluded by the language "[n]ot incorporating a cathode ray tube."  The articles described in subheadings 8473.30.6000 and 8473.30.9000 must contain a CRT, as that is the only classification possibility of "other."

Accordingly, in order to be classified in subheading 8473.30.9000, the merchandise must be a part or accessory of the machines of heading 8471 and that part or accessory must incorporate a CRT.  Because the merchandise at issue did not incorporate a CRT, we affirm the Court of International Trade's holding that UPS misclassified certain merchandise under subheading HTSUS 8473.30.9000.

B

Section 1641 of Title 19 is drawn to customs brokers.  Subsection (b)(4) of § 1641 is entitled "[d]uties" and states "[a] customs broker shall exercise responsible

supervision and control over the customs business that it conducts." "Responsible

supervision and control" is defined in 19 C.F.R. § 111.1:

> Responsible supervision and control. "Responsible supervision and control" means that degree of supervision and control necessary to ensure the proper transaction of the customs business of a broker, including actions necessary to ensure that an employee of a broker provides substantially the same quality of service in handling customs transactions that the broker is required to provide. <u>While the determination of what is necessary to perform and maintain responsible supervision and control will vary depending upon the circumstances in each instance, factors which CBP [Customs & Border Protection] will consider include, but are not limited to</u>: The training required of employees of the broker; the issuance of written instructions and guidelines to employees of the broker; the volume and type of business of the broker; the reject rate for the various customs transactions; the maintenance of current editions of CBP Regulations, the Harmonized Tariff Schedule of the United States, and CBP issuances; the availability of an individually licensed broker for necessary consultation with employees of the broker; the frequency of supervisory visits of an individually licensed broker to another office of the broker that does not have a resident individually licensed broker; the frequency of audits and reviews by an individually licensed broker of the customs transactions handled by employees of the broker; the extent to which the individually licensed broker who qualifies the district permit is involved in the operation of the brokerage; and any circumstance which indicates that an individually licensed broker has a real interest in the operations of a broker.

(emphasis added).

UPS argues that Customs is required to consider all of the factors set forth in

19 C.F.R. § 111.1 when determining whether a broker exercised responsible

supervision and control. The government contends that deference is due Customs'

interpretation of its own regulation and that where a regulation consists of possible

factors, it is left to Customs' discretion to weight the factors as deemed appropriate.

Deference is indeed due an agency's interpretation of its own regulation. In fact,

such an interpretation will be upheld "unless it is plainly erroneous or inconsistent with

the regulation." <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410, 414 (1945); <u>see</u>

also Auer v. Robbins, 519 U.S. 452, 461-62 (1997); Arbor Foods Inc. v. United States, 97 F.3d 534, 540 (Fed. Cir. 1996). Here, however, Customs' interpretation of 19 C.F.R. § 111.1 was inconsistent with the regulation itself.

The regulation explains that what meets the "responsible supervision and control" standard will vary in each case. However, § 111.1 lists ten "factors which [Customs] will consider." (emphasis added). "Will" is a mandatory term, not a discretionary one. See New England Tank Indus. of N.H., Inc. v. United States, 861 F.2d 685, 694 (Fed. Cir. 1988) (noting the difference between the mandatory terms "will" and "will not" and discretionary terms such as "should"). Thus, any interpretation of § 111.1 that does not require consideration of the listed factors is clearly inconsistent with the plain language of the regulation.

Customs, of course, has discretion in how it weighs each of the factors listed in § 111.1. Additionally, the regulation makes clear that Customs is free to consider other factors in addition to those listed. See 19 § C.F.R. § 111.1 (listing "factors which [Customs] will consider include, but are not limited to . . . ."). However, this discretion does not absolve Customs of its obligation under the regulation to consider at the least the ten listed factors.

The government argues that such an interpretation is unreasonable given that not all of the factors listed in § 111.1 would apply in every instance. The applicability of each of the factors to a particular situation is irrelevant. Customs can simply explain that a particular factor does not apply and move on from there. Nothing in the regulation suggests that such treatment is improper.

An agency must follow its own regulations.  See Fort Stewart Sch. v. Fed. Labor Relations Auth., 495 U.S. 641, 654 (1990) ("It is a familiar rule of administrative law that an agency must abide by its own regulations.").  Here, Customs failed to do so.  The government argues that Customs did in fact consider the factors listed in § 111.1.  As evidence of this, the government points to a three-page excerpt in the record which includes testimony by Supervisory Import Specialist Lydia Goldsmith.  However, we do not see where all ten factors were even mentioned in the testimony.  Additionally, where specific factors are discussed in the testimony, it is difficult to determine if those factors were actually considered by Customs.

Because Customs did not consider all ten factors listed in 19 C.F.R. § 111.1, its determination that UPS violated 19 U.S.C. § 1641 was improper.  Accordingly, we vacate that portion of the Court of International Trade's judgment and remand for further proceedings.

C

Our holding that Customs improperly concluded that UPS violated 19 U.S.C. § 1641 moots the remaining issues briefed by the parties, and we decline to reach them.  See United States v. Alaska S.S. Co., 253 U.S. 113, 116 (1920) ("[I]t is a settled principle in this court that it will determine only actual matters in controversy essential to the decision of the particular case before it."); see also Elkem Metals Co. v. United States, 468 F.3d 795, 803 (Fed. Cir. 2006) (concluding that because an amount was properly excluded from constructed value, the issue of whether the party correctly reported that amount was moot and need not be decided).  These issues are whether there were in fact multiple violations of § 1641 and whether Customs can impose

penalties aggregating more than $30,000, <u>see</u> 19 C.F.R. § 111.91 ("Customs may assess a monetary penalty or penalties as follows:  (a) In the case of a broker in an amount not to exceed an aggregate of $30,000 . . . ."). Although these issues are important to the parties and the industry, deciding them would be premature. Accordingly, those portions of the Court of International Trade's judgment addressing these issues are vacated.

<u>AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED-IN-PART</u>

COSTS

No costs.